**NATIONAL LABOR RELATIONS BOARD
v. TEX–O–KAN FLOUR MILLS CO.**

No. 9848.

Circuit Court of Appeals, Fifth Circuit.

Aug. 5, 1941.

Robert B. Watts, Gen. Counsel, and Laurence A. Knapp, Associate Gen. Counsel, National Labor Relations Board, both of Washington, D. C., and L. N. D. Wells, Jr., Regional Atty., of St. Louis, Mo., for petitioner.

Geo. O. Wilson, of Dallas, Tex., for respondent.

Before FOSTER, SIBLEY, and HUTCHESON, Circuit Judges.

SIBLEY, Circuit Judge.

The order of the National Labor Relations Board here sought to be enforced requires the Tex-O-Kan Flour Mills Company to cease and desist from discouraging membership in two named local labor unions, and from in any other manner interfering with, restraining, or coercing its employees in the exercise of their rights under Section 7 of the National Labor Relations Act, 29 U.S.C.A. § 157; and as affirmative action, to offer reinstatement to twenty-nine named former employees, and to make each whole for loss of pay; and post appropriate notices in its Morten and Burrus Mills. The respondent attacks the jurisdiction of the Board, and each item of the order as not supported by evidence.

The question of jurisdiction stands thus. No evidence was taken as to the interstate character of respondent's business, but a stipulation was filed to the effect that during the fiscal year ending May 31, 1938, at the Morten Mill at Dallas, Texas, 3,395,232 bushels of grain having a value of $2,985,060 were processed, about twenty percent of which came from States other than Texas; and of the resulting product, of a value of about $3,970,569, about 30.75 percent was shipped to States other than Texas. During the same period at the Burrus Mill at Saginaw, Texas, 3,289,087 bushels, of a value of $3,925,710 were processed, about twenty percent of which was purchased out of the State; of the products worth $5,711,722, about 40.8 percent were shipped out of the State. The Board found those special facts, and made the general finding that the activities of the respondent with respect to the unions and their members in connection with the milling operations above set forth, have a close, intimate and substantial relation to trade, traffic and commerce among the several States, and tend to lead to labor disputes burdening and obstructing commerce and the free flow of commerce. The argument is that the stipulation and the Board's findings relate to the year ending May 31, 1938, and not to the period under investigation which extends from Oct. 30, 1938, when the local unions were established, through July, 1939. The stipulation was intended to give exact information for the preceding fiscal year, the last apparently for which the record had been made up. The evidence indicates that each mill continued to run in about the same way. No one contended that the amount and character of their business changed, except that in the spring business fell off some. We think the parties and the Board intended the figures for the preceding year to be taken as typical. Those figures show a substantial interstate business going on, interruption of which by labor troubles would affect commerce within the meaning of the Act, as the Board expressly found. The Board has jurisdiction, and the facts showing it sufficiently appear.

The stipulation states that all grain came to rest in Texas before being

processed, and that the acts complained of did not in fact burden or obstruct commerce, or the flow of goods therein. Neither fact is of controlling importance. The Act seeks to forestall labor troubles which may affect commerce, not merely to stop or remedy those which have occurred; and commerce may be affected though the laborers are not themselves engaged in commerce. National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352.

■ After the Board made its order, the respondent moved the Board to set it aside on the ground that it did not follow the findings and recommendations of the trial examiner who heard and saw the witnesses; that there existed, unknown to respondent a bitterness, resentment and prejudice between the examiner and the Board which later flamed into a public controversy and that this prejudice had reacted unfavorably on respondent's case, all of which was offered to be proved. A de novo hearing before another examiner was prayed. The Board denied the motion. We do not think any illegality in the order results. The Board is in no case bound to follow the fact-findings or recommendations of an examiner. Even on a question of the credibility of contradictory witnesses, notwithstanding the advantage the examiner has of seeing and hearing them testify, the Board may differ from the conclusion of its examiner. It is not claimed that the examiner or the Board had any prejudice against the respondent. We cannot see that personal feeling between them would be likely to affect a fair consideration of the report on respondent's case. The findings of the Board show no undue criticism of the examiner, but only reasoned differences of opinion. If the Board was in any way prejudiced, the Act provides no remedy before us. We cannot form a new Board, nor even order a reconsideration of the case for any partisanship we might think was apparent. We must assume a conscientious and fair consideration of the evidence by the Board and are bound by all its fact-findings which are supported by substantial evidence, regardless of the opinion of the examiner or ourselves as to the real truth.

■ It is urged that the proceedings are invalid because the Board, without hearing from respondent, consolidated for complaint and hearing the charges made by separate unions at the two separate mills. The charges are addressed to the Board and are not cases at all. The case between the Board and the employer begins with the complaint prepared by the Board. It may relate to as many mills or employees as the employer may have. It is within the discretion of the Board what and how many matters touching the same employer shall be included. The findings and conclusions in this case are separately made as to each mill, and disconnected occurrences at the two mills do not appear to have been illogically confused.

The two mills, about thirty miles apart, were during the period in question separately managed, though owned by a single foreign corporation. The general manager at the Burrus Mill was J. Paul Smith, and under him was a general superintendent Paul K. Fisher, and under him as superintendent of warehouse and packing A. E. Howse. These all had the power to "hire and fire" and to control employees. No one else had. At the Morten Mill, Blaine Thompson was general manager. W. H. Chambliss was superintendent till Feb. 13, 1939, when Fisher took over his job also. These only could employ and discharge hands there. There were foremen at both mills, but with no authority to formulate the policy of their mill, and it is positively testified without contradiction that none of them had been authorized or requested or was known to be meddling with the relations between the mill and its employees. Except as Fisher was superintendent at both mills after Feb. 13, 1939, there is no evidence of cooperation between the managements. The occurrences at the two mills ought to be separately considered, though in many respects similar.

Wage cuts at both mills occurred in October, 1938, when the Fair Labor Standards law went into effect. At both mills, about the first of November, unions were started. At each mill it is found that manager, superintendent and foremen talked against the unions. The foremen were particularly outspoken, and several said the men would lose their jobs, and the mill would be closed down if the union was pushed. After Dec. 15, the union members had received and generally wore while at work their union buttons. At each mill a statement to the management

was circulated among the employees for signature expressing content with labor conditions, and was presented to the general manager. The unions were not suppressed, but continued. Not all the employees at either mill joined. Some but not all union members were laid off professedly for lack of work, or discharged for cause, and some non-union employees were similarly dealt with. The Board's regional director took up with Morten Mill's manager the first cases of discharge on Nov. 8th, the day after they happened. The other alleged discriminatory acts there occurred afterwards, and were not brought forward for investigation except by amendment of the charges and the complaint in July and August, 1939. The examiner's report was filed Jan. 29, 1940. He found unfair labor practices had occurred at both mills, consisting of interference with union organization; and at Morten Mill discriminatory discharges and refusals to reemploy John Marple, O. H. Kirby, Loys McMurray, F. L. Fielding, Jim Arnold and Billie Hansell; but found against the charges of discrimination for union membership as to E. C. Carey, J. C. Penney, Roy Franks, H. P. Baker, Ed. Short, Robt. Stewart, M. L. Brittain, Jimmie Ervin, Samuel Vodnick, employees at Morten Mill, and against all twenty such charges at the Burrus Mill. The Board upheld the examiner in all his findings against each mill, but found additional discrimination at the Morten Mill as to Carey, Baker, Stewart, Ervin and Vodnick, and at the Burrus Mill found discrimination as to G. W. Stewart, V. E. Newland, R. H. Tomlin, Jack Burns, H. P. Chisum, L. W. Mitchell, and a group laid off March 29, 1939.

█ As to interference with union organization we think the evidence justifies the conclusion that there was interference by the employer at both mills. We do not emphasize what mere foremen did and said, who had no power to hire and discharge employees or formulate labor policies, and who are positively testified to have been given no such duty or authority in these cases. Many of their statements testified about do not purport to have been uttered as foreman, but as fellow workman, expressing opinion or fear as to the result of the contemplated course. We have more than once said that such foremen, eligible to union membership, are as much entitled to discuss unions as anyone else. It is only when they are authorized or encouraged to act for the management, or when conduct amounting to interference becomes known to the management and goes unrebuked, that what they say may be charged to the employer. We need not in this case say more, because as the Board points out enough is testified to have been done and said by the managers and superintendents themselves to amount to interference and justify a cease and desist order. It is quite easy for management to freely recognize and sincerely and openly acknowledge the right to self-organization established by the Act; a cease and desist order on this point costs no money and only warns to observe a right which already existed; evidence short of demonstration may easily justify such an order.

█ Orders for reinstatement of employees with back pay are somewhat different. They may impoverish or break an employer, and while they are not in law penal orders, they are in the nature of penalties for the infraction of law. The evidence to justify them ought therefore to be substantial, and surmise or suspicion, even though reasonable, is not enough. The duty to weigh and test the evidence is of course on the Board. This court may not overrule a fact conclusion supported by substantial evidence, even though we deem it incorrect under all the evidence. Only when the evidence is such that in a jury trial it would be insufficient to support a like verdict may the judges interfere. National Labor Relations Board v. Columbian Enameling & Stamping Co., 306 U.S. 292, 59 S.Ct. 501, 83 L.Ed. 660; Appalachian Electric Power Co. v. National Labor Relations Board, 4 Cir., 93 F.2d 985. So far as the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., goes, the employer may discharge, or refuse to reemploy for any reason, just or unjust, except discrimination because of union activities and relationships. In the matters now concerning us, the controlling and ultimate fact question is the true reason which governed the very person who discharged or refused to reemploy in each instance. There is no doubt that each employee here making complaint was discharged, or if laid off was not reemployed, and that he was at the time a member of the union. In each case such membership may have been the cause, for the union was not welcomed by the persons having authority to discharge and employ. If no other reason

is apparent, union membership may logically be inferred. Even though the discharger disavows it under oath, if he can assign no other credible motive or cause, he need not be believed. But it remains true that the discharger knows the real cause of discharge, it is a fact to which he may swear. If he says it was not union membership or activity, but something else which in fact existed as a ground, his oath cannot be disregarded because of suspicion that he may be lying. There must be impeachment of him, or substantial contradiction, or if circumstances raise doubts, they must be inconsistent with the positive sworn evidence on the exact point. This was squarely ruled as to a jury in Pennsylvania R. R. Co. v. Chamberlain, 288 U.S. 333, 53 S.Ct. 391, 77 L.Ed. 819, and the ruling is applicable to the Board as fact-finder. That the witness was or is an employee of the party in whose behalf he testifies, is not in itself a reason to discard his oath, appears from the cited case, and was extensively demonstrated in Chesapeake & Ohio R. Co. v. Martin, 283 U.S. 209, 51 S.Ct. 453, 75 L.Ed. 983.

### Discharges at Morten Mill.

We apply these principles, and first as to the discharges at Morten Mill in which discrimination was found by both the examiner and the Board.

 Marple and Kirby who were the first discharged, each only a week after the union was formed, were president and secretary of the union. They were discharged by superintendent Chambliss, who refused to give them any reason for their discharge. There had been no complaint of their work. The Board found that a foreman, Hudson, told another employee that he thought the discharge was on account of the union. We do not think Hudson's opinion about it was relevant, as he had nothing to do with the discharge. If he knew any fact to support that opinion he ought to have been called to testify to that fact. Chambliss, the superintendent, did not testify. The manager Thompson testified generally there was a lay off because of light work, but he did not do this discharging, and these men were never called back and others were newly employed on the same work. The conclusion of discrimination may stand.

 The following day, Nov. 8, E. C. Carey was discharged by Supt. Chambliss on the ground as he then stated that Carey's job had been abolished in the interest of economy. The regional director at once complained of this discharge also, but on Nov. 30, 1938, advised the manager Thompson that the charge was withdrawn, and it was not renewed till July 25, 1939. The job was "packer foreman", mainly supervision of packing machinery and work. The manager testifies positively that the job was abolished, that there was no need for it, and it appears from other witnesses that its duties were afterwards performed by members of the packing crews. The examiner, on the ground that the job was abolished and that it did not appear that at the time of the discharge the management even knew Carey was a member of the union, held it not a case of discrimination. The Board indeed states that Carey did not join the union till Nov. 13, five days after his discharge, but concluded that because Chambliss had seen him talking with a union organizer and had told Marple and Kirby on Nov. 7 that others would be discharged, it is to be inferred that Carey was discharged for union leanings. We think the Board's inference too weak, and that the examiner was right. There was no rule of seniority established by contract or otherwise, so Carey was not entitled, as he requested, to displace someone else.

 F. L. Fielding was transferred from sweeper to feed packer Nov. 1, 1938, to relieve his brother who was on vacation till Nov. 15. He was injured at home Nov. 15, and under medical care till Dec. 18, when he sought to work again and was refused by Supt. Chambliss. He had joined other union members in a petition to reinstate Marple, Kirby and Carey. Chambliss was not a witness. Manager Thompson says Fielding was not discharged, but not reemployed because there was no work available. The evidence does not show that his being a union member had anything to do with that refusal. It is found, however, that between March 8 and Sept. 9 following four new sweepers were hired, Fielding not being called in. Both the examiner and the Board were convinced thereby that he was then discriminated against by not being reemployed, no other reason then appearing for not giving him his old job. We think the conclusion may stand.

 Loys McMurray had a dispute with Supt. Chambliss which involved a union button and the misweighing of flour. After Chambliss was superseded by Fisher, Fisher as superintendent discharged him on March 11, for inefficiency as Fisher said, but mana-

ger Thompson said because of slack business. A non-union employee who had been laid off took McMurray's place, so Thompson must be wrong. The examiner and the Board thought on the whole that he was discharged to make place for the non-union man. The finding may stand.

█ Jim Arnold and Billie Hansell were discharged June 12, 1939, for packing in the wrong sacks 280 sacks of flour. Arnold had succeeded Kirby as secretary of the union. They had refused to sign the anti-union statement to the manager. The mispacking did occur, because they used a pile of sacks pointed out by the sack boy instead of looking, as they should have done, at the "run sheet" posted for their guidance. Their overseer discharged them for this reason at the superintendent's order. They appealed to the manager, who sustained the discharge on that ground. He explained the costly, even disastrous effect of such errors. Hansell, a negro, testified to a conversation with the manager two days later in which he said the manager in effect stated it was a pretext as to Arnold and he was going to fire the whole damned bunch in six weeks' time, and had $65,000 to break up the union and would have no such damned thing as a union. The examiner believed this, though denied by Thompson. The Board, with a better judgment, did not, but thought that because there were mitigating circumstances about the mistake and these men had served long with a good work record, the mistake was seized on as a pretext, the real reason being union membership. Fisher testified positively that he discharged these men because of their inattention to the work and for no other reason. Aside from Hansell's testimony, not accepted by the Board, we do not think there is substantial evidence to overcome this testimony and show that these discharges were not for the mispacking of the flour.

The Board differed with the examiner by holding the following to be discriminations at Morten Mill.

█ H. P. Baker, a charter member of the union, was discharged Feb. 8, 1939. Superintendent Chambliss told him then he would not longer be needed because they were discarding his job. Baker was assured he had done nothing wrong. Baker then asked for some other job, as he had seniority over many holding other jobs. Baker was packing meal, and he admitted that the mill then ceased to make meal and had never recommenced. He was known to be a union man, and had refused·in December to sign the anti-union statement. Yet on June 19, 1939, he was recalled for work as a flour packer, still wearing his union button. On Aug. 30, 1939, he was again laid off because of a reduction in force. Fisher said he was let out rather than some other because he was not a first class flour packer. Thompson testified Baker was a very good man and would be taken back when his services were needed. The Board thought his first lay off Feb. 8 was discriminatory. Since his employment as meal packer was then terminated, and since there is no rule of seniority in the mill by which one man may displace another in different employment, the conclusion is doubtful. As to the second lay off on Aug. 30, the Board finds that for several weeks immediately following, the flour packers worked overtime each day from one to twelve hours. They concluded that Thompson's testimony, being also the reason assigned at the time, that business was too slack to employ Baker, was incorrect and that Fisher's complaint of inefficiency was also untrue, being in conflict with Thompson, leaving Baker's unionism as the probable true cause of his final lay off. We cannot say the conclusion is illogical and unsupported by evidence.

█ Jimmie Ervin, an employee for sixteen years in the "booster gang", wearing a union button since November, 1938, was laid off Aug. 9, 1939, as part of a reduction in force throughout the mill. Samuel Vodnick was laid off under similar circumstances on the same day. Robert Stewart, another member of the booster gang, was also laid off on Aug. 9. He had previously been laid off and recalled several times. It is not shown that the superintendent's and manager's testimony is untrue that the reduction in force was actual and necessary. No one else took these men's places soon afterwards. The superintendent swears positively that no lay off of any man was because of union membership. On Aug. 3 the Board had issued notice of a hearing on other discriminatory discharges to be held Aug. 14. So it seems very unlikely that other such discharges would take place on August 9th. There is no established rule of seniority at this mill, and it is not necessarily true, as the Board argued, that one who has served sixteen years is more efficient at "booster" work, which is trucking and general labor, than a younger man. We do not think the evidence overrides the positive oath of Fisher and

Thompson as to the cause of discharge of these men.

### Discrimination at Burrus Mill.

The examiner found none. The Board disagreed except as to one. The superintendent Fisher testifies very positively that union membership in no case, and most of them were specifically asked about, had any part in any discharge or lay off at this mill, and he had never authorized anyone below him to discharge or lay off for such a reason. The manager, Smith, testified he had nothing to do with the cases of Stewart, Newland and Tomlin, so far as he remembered, but he reviewed some other cases, and the lay off of eighteen men on March 29, 1939, he authorized and it was done to reduce the force so that each man might have a full week's work.

V. L. Newland, G. O. Stewart and R. H. Tomlin were feed packers, charged with the duty of weighing accurately the contents of each bag. It is abundantly established that this is necessary to avoid misbranding under State and federal laws, and because any underweight loses customers, and overweight is a loss to the mill. Each weigher was required to use standard test weights to see that his scales were accurate, before beginning to weigh. After general warnings, on Nov. 21, 1938, a check up on weights was instituted. Newland was found to have fifty bags each six pounds overweight, and Stewart's weights were declared "uneven", that is sometimes over and sometimes under, though he testified they were from three to five ounces over. These were discharged and refused the privilege which had sometimes been extended of repacking on their own time. Tomlin had knowledge of the discharges and says he was extra careful. He admits one bag of his was found one-half pound underweight, but denied general irregularity in weights testified to by the tester. The examiner found that the under-superintendent, Howse, who discharged them, did not know they were union men and could not have discriminated on that basis. The Board found from circumstances that Fisher probably knew it. Since Howse did the discharging, we do not think what Fisher may have known is material. Howse seems to have been harsh in not allowing correction on the employees' time, but the justness of the discharge is not the question. The question is whether there is substantial evidence that it was done because they were union

men. We think the evidence insufficient to override the sworn denials.

Jack Burns was discharged by Howse Jan. 6, 1939, for having the previous day loaded the wrong kind of flour in a car. Burns testified his foreman Wilson had directed him to load that flour. He admitted that he was loading on a written instruction posted in the car, and had not read it at all. He said verbal instructions of the foreman were sometimes followed. Howse made no investigation, because as he said the error was plain and he had Burns' signature as to who did the loading. It does not appear that Burns told him it was Wilson's error. This evidence may show an unjust discharge, but we do not think it proves false the testimony of Howse that the error was the sole ground of discharge, and that of Fisher that he had never authorized Howse to consider union affiliation in discharges, and had never considered it himself at Burrus Mill. The circumstances raise only a suspicion otherwise, at most.

H. P. Chisum, a union man, was laid off March 17, 1939, for not having reported on March 14 that he was sick, as required. He lived eighteen miles from the mill and had in fact reported through another employee and his place was filled, and Howse was so informed. There was evidence that Howse had threatened to "get" him. Howse did not deny this, nor specifically that union activity was the real reason. Fisher's denial can mean only that he did not authorize a lay off for union membership, since Howse and not he acted in this case. Since the ground of lay off put forward by Howse was to his knowledge untrue, the Board was justified in seeking another ground, and we cannot say their conclusion is without or against the evidence.

L. W. Mitchell, a flour packer and a union man, was discharged Aug. 31, 1939, for purchasing irregularly 700 old bags as junk, some of which the mill management contended were good. The bag man who could have sold the bags to Mitchell was not present, and Mitchell assembled and took the bags himself, though he informed the bag man of it. Mitchell had some of the bags cleaned and offered to sell them elsewhere. When Smith the manager was called by 'phone and informed that Mitchell was selling bags, Smith had Howse investigate the matter. Howse did not charge that Mitchell had acted with dishonest purpose, but ir-

regularly and contrary to instructions. Howse discharged Mitchell and Smith approved it, testifying positively it was because of the bag transaction and that union membership had nothing to do with it. Mitchell swears that Howse never mentioned union to him in his life. Howse testifies that the discharge was for Mitchell's conduct about the bags and nothing else, and that he did not know Mitchell was a union man. We do not think that what Mitchell says transpired between him and Smith about the union eight months previously is enough to override this testimony.

About March 29, 1939, eighteen men were laid off. Thirteen who were union men were included in the amended charges filed July 25, 1939, as objects of discrimination. Seven were truckers and car loaders, and five were flour and feed packers and one a sweeper. The ground of lay off then assigned and positively testified to by manager Smith and superintendents Howse and Fisher was that there was not work enough for so many men, and it was better to give the men retained full week's work. This was explained to the Board's regional director at the time. Two of the men laid off were not union men. Both of them and two union men were later reemployed. The Board finds eight new men were employed between March 29 and Sept. 20, 1939, the date of the hearing. Three of these were sweepers, two employed in June and one Sept. 20. Four are listed as in the warehouse, possibly for the loading gang, but two of these are listed as employed before March 29, 1939, and one in September. No packer was added. Four negroes were temporarily hired in September for doing cleanup work around the outside. They did not take the places of the men laid off. The Board finds that after March 29, and especially in September, and wholly in the warehouse and loading department, considerable overtime was paid. It does not appear that this was true immediately after the date of lay off, as in the case of Baker above. There was some shifting of retained men, but this does not tend to disprove the truth of the reason given for the lay off, since it was to equalize the work. There is a finding of anti-union talk by foremen to some of the laid-off men in the previous November and December. It is not shown to have any connection with the general lay off, determined on and carried out by the manager in March. The superintendents determined which men should be laid off and which retained. They swear positively that union membership did not enter into their selection, and this is borne out by the facts that all union men were not laid off while two non-union men were, and Nichols, the union president, was retained. The superintendents say there was no established rule of seniority, but they considered length of service, need, family circumstances, as well as efficiency, and did their best to give a "square deal". On these facts we think it inadmissible to conclude that each of the thirteen men was laid off because he was a union man.

We have overruled the conclusions of the Board only in cases where there was given at the time a credible cause for discharge or refusal to reemploy, which was admitted or the Board found to exist, and where the person or persons acting for the employer positively testified that union activity was no part of the cause, and there was no contradiction on that point directly, or by circumstances that were really inconsistent with that testimony.

Superintendent Chambliss did not testify. The Board, it appears, had him subpoenaed but he was not present at the hearing. Respondent made no request for delay because of his absence. After the Board made its decision an unsworn motion was filed to reopen the case and take his evidence, which stated respondent did not know where Chambliss was till a few days before. There was no affidavit from him or anyone else as to what his testimony would be. The Board denied the motion. This is complained of as an error. No motion was made before us about it. We are not a general court of errors for the Board, but if the review of such matters is within our province, we cannot say the Board acted illegally in refusing the motion under the circumstances.

By consent of the Board the provision in their order for repaying to relief agencies money received from them will be stricken.

The Board's order will be upheld in requiring the respondent to cease and desist as specified in paragraph 1(a), such matters being within the scope of the adverse findings. Paragraph 1(b) is too broad because it covers the whole ground of the Act, and specially names things as to which the respondent has not transgressed. National Labor Relations Board v. Express Publishing Co., 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930. It ought to be modified by

confining it to "other like" modes of interference or coercion. The order for affirmative action will be modified so as to exclude from it E. C. Carey, Jim Arnold, Billie Hansell, Robt. Stewart, Jim Ervin, Samuel Vodnick, G. W. Stewart, V. L. Newland, R. H. Tomlin, Jack Burns, L. W. Mitchell, Emory Kreidel, H. E. Smith, G. W. Smith, R. M. Davis, C. M. Hardgrove, A. L. Hampton, F. M. Maddox, J. C. Carroll, C. W. Fidler, Herbert Cowsert, J. H. Atchison and C. C. Wilson. As modified, the order of the Board is sustained and will be enforced. A decree may be presented accordingly.