## NATIONAL LABOR RELATIONS BOARD v. ALCO FEED MILLS.

### No. 10463.

Circuit Court of Appeals, Fifth Circuit.

Feb. 15, 1943.

420

Robert B. Watts, Gen. Counsel, and Ernest A. Gross, Associate Gen. Counsel, National Labor Relations Board, both of Washington, D. C., and Dan M. Byrd, Jr., Atty., National Labor Relations Board, of Atlanta, Ga., for petitioner.

John L. Westmoreland, of Atlanta, Ga., for respondent.

Before SIBLEY, HOLMES, and Mc-CORD, Circuit Judges.

SIBLEY, Circuit Judge.

The National Labor Relations Board asks a decree enforcing its order dated June 26, 1942, that Alco Feed Mills cease and desist from interfering with its employees in organizing for collective bargaining and reinstate with back pay Leavy Clay, an employee found to have been laid off discriminatorily because of union activity. Alco Feed Mills contends that both branches of the order are unsupported by evidence.

There is no substantial conflict. The facts briefly are that during October, 1941, Clay obtained from C. I. O. headquarters in Atlanta application cards for union membership, signed one himself, and got sixteen other of the twenty-four persons employed in the mill to sign. The employees were all negroes. On Nov. 8, 1941, he was laid off for the assigned reason of slack business in the chicken feed department where he worked. Two others not shown to be union men were laid off in that department the week following. On Nov. 12 one Sirmans for C. I. O. wrote a letter to the president of the mill, asking that C. I. O. be treated with as bargaining agent, having been selected by a majority of the employees. The president was ill and the letter was read by the manager, R. C. Avrett, and the mill foreman Clark Frazier, who are white men. The foreman took his timebook and asked each millhand whether he was signed up with the union, noting by a mark on the book the answer, but making no threat or comment. He says he did this because he thought the manager would wish the information. The following day, Nov. 13, the Board's Regional Director sent a notice to the mill to be posted, which was to the effect that the employees had a right to organize and select bargaining representatives of their choice without interference by the employer. This notice was posted in the bulletin board at once, and was still there at the time of the examiner's hearing Jan. 15, 1942. No other union men appear to have been discharged and no further interference is shown. Clay did not apply to be reemployed, he stating that he lived nearby and supposed Mr. Frazier would send for him if he needed him. It is stated in argument that he was reemployed in May, some weeks before the Board's order was made.

There was also evidence that one Walter Willis was the oldest employee, could read and write, and was given the written orders for mixing the horse feed in that department, and was a sort of foreman over eight or nine others engaged in the mixing. He was paid five cents per hour more than the others. He had no power to "hire or fire" men, or discipline them, or make recommendations about the labor and never made any about Clay or any-

one else. Willis attended a union meeting in October but did not join. On Nov. 6 he expressed to a fellow worker his disapproval of the union, and said that if "Mr. Frazier finds out about it they (those concerned) are going to lose their job; Mr. Fraizer was going to have to let Leavy Clay go because he was getting too smart trying to organize a union in the mill." Two days after Clay's layoff Willis called attention to his words having come true. Willis himself was not called as a witness, though available. There was no proof that the conduct of Willis was known to any official of the company, but on the contrary that Willis had never been conferred with about labor matters.

■ We do not think Willis is shown to have been acting for the Company in saying what he did. He had no authority in the matter; his conduct was not known to or approved by his superiors. His words seem to have been the expression of his own ideas as a fellow employee. If he claimed to know anything about Fraizer's intentions, he ought to have been called by the Board to testify, for the burden of proof was on the Board. But the act of Fraizer on Nov. 12 in polling the men touching their union connection and recording it on the timebook in their presence, was the act of the Company, and may have implied a threat of some action to come. It is evidence of interference. Because of it the order to cease and desist from interference is supported. Compare National Labor Relations Board v. Tex-O-Kan Mills Co., 5 Cir., 122 F.2d 433, 438.

■ The finding that Clay was discharged on Nov. 8, for union activity, we think is not supported by evidence. There is no history of antecedent hostility against unions. There is no pattern of discharges of union men, Clay being the only one. Willis' prediction is not traced to anyone concerned in the layoff. The bare fact that Clay had, single-handed, organized the mill would, if those who laid him off had not testified, barely support a conclusion that this was the reason he had been singled out. But those who laid him off, and who know as a fact why they did it have testified. Avrett says the chicken feed, at mixing which Clay worked, was always in less demand during the fall and winter, and that on Nov. 7 he instructed Frazier to lay off three men from that work, not naming Clay, or caring whom he laid off. Frazier asked to retain two for a week longer to fill certain orders. Avrett agreed to that. Frazier said he laid Clay off first only because another man knew more about oiling and caring for the machinery. All three were laid off by the end of the next week. Whether the other two were union or non-union men does not appear. They had less seniority in employment than Clay, but seniority was not observed much in the mill. Both Avrett and Frazier testified positively that Clay's union activity had nothing to do with his layoff, that they had no antipathy to a union, recognized the right of their employees to organize, and willingly posted the notice to that effect. But of special force is their positive and repeated testimony that they had no knowledge whatever of any move to establish a union till they saw the letter on Nov. 12 announcing it. This was five days after the order to lay off was given and four days after it was executed. The layoff could not have been for union activity if it is true that none was at the time known. Clay and the others all testify that the activity was secret; all union cards were signed at his home or the union headquarters, and all discussions were in freight cars on the railroad at lunchtime. Avrett and Frazier are impeached in no way known to the law. What they say is not contradicted by any witness or any positive circumstance. Their testimony cannot be put aside. It is true or else perjury. That the witnesses are employees of the Company is not sufficient to discredit what they say, if reasonable and uncontradicted and the witnesses are not impeached. Chesapeake & O. R. Co. v. Martin, 283 U.S. 209, 51 S.Ct. 453, 75 L. Ed. 983; Pennsylvania R. Co. v. Chamberlain, 288 U.S. 333, 53 S.Ct. 391, 77 L.Ed. 819. These principles, which apply in testing whether the evidence will support a jury verdict, apply to the findings of the Board. National Labor Relations Board v. Columbian Co., 306 U.S. 292, 300, 59 S.Ct. 501, 83 L.Ed. 660; National Labor Relations Board v. Tex-O-Kan Mills Co., 5 Cir., 122 F.2d 433, 438. The finding that Clay was laid off discriminatorily for union activity we think is not sustained by evidence.

A decree may be prepared in accordance with this opinion.