## P. H. GLATFELTER CO. v. NATIONAL LABOR RELATIONS BOARD
### No. 8491.

Circuit Court of Appeals, Third Circuit.

Argued Jan. 17, 1944.

Decided March 22, 1944.

Ralph F. Fisher, of York, Pa., for petitioner.

Albert P. Wheatley, of Washington, D. C., for respondent.

Before JONES and McLAUGHLIN, Circuit Judges and KALODNER, District Judge.

McLAUGHLIN, Circuit Judge.

The only question involved here is whether the Board's findings of fact that petitioner has engaged and is engaging in unfair labor practices within the meaning of Section 8 (1) and (3) of the National Labor Relations Act, 29 U.S.C.A. § 158(1, 3), are supported by substantial evidence.

Petitioner is a paper manufacturer. The unfair labor practices complained of are: (a) the laying off and demotion of Roy Baublitz from his former position as digester operator in petitioner's pulp mill to a position of yard laborer, because of his union membership and activity; (b) the questioning of employees, concerning union activities and affiliation; curtailing an employee's smoking privileges because of his union organizational activities; and making statements showing hostility to District 50, United Mine Workers of America.

Roy Baublitz, at the time of the incidents complained of before the Board, had been employed by the petitioner for about seven years in its digester room and was an operator in that room. The digester room of petitioner's plant contains five digesters which are used in cooking wood pulp; and two washers for cleansing the cooked pulp mass of the used solution. Wood chips are fed to the digester by means of an overhead conveyor system. Baublitz' father was an employee of the company and had been such for over forty-one years. He was a small holder of preferred stock in the concern. From the latter part of May 1942 Roy Baublitz had been interested in organization work, for District 50, United Mine Workers of America, among petitioner's employees. One Stevenson was the organizer for this union. In the latter part of October 1942, the president of the corporation instructed George Baublitz, the father, to tell his son "to quit going around with him or he will find himself in trouble." The "him" referred to was taken by George Baublitz to mean Stevenson. President Glatfelter denied that he referred to Stevenson. The Board found that he did mean Stevenson. The testimony, and inferences therefrom, support this finding.

On January 9, 1943, Roy Baublitz left the digester room about twenty minutes before quitting time. This was in line with the usual custom. Baublitz testified that he told his helper, Dubbs, that he was leaving in order to clean up. Baublitz further said that Dubbs answered that he would watch the digester. About ten minutes prior to the end of the shift, Dubbs shut down the washers in the digester room, but not the conveyor itself. He, too, went to the locker room. On his way he met his relief man, Bollinger, and told him that he was going to wash up. Bollinger arrived at the digester room about eight minutes before quitting time, or 6:52 A.M. Dubbs met Baublitz in the locker room and Baublitz testified that Dubbs told him that he had

632

looked at the digester and that it was "not near full" and informed him that Bollinger had gone up to the digester room. Baublitz further said that Keeney, his own relief, then came in to the locker room and was told by him that the digester was being filled but that the caustic solution had not yet been added. Keeney testified that he arrived at the digester room about five minutes of 7. He found that Bollinger had shut the conveyor off and that it was overloaded with chips. He later discovered that the conveyor chain was slipping and that a sprocket wheel was broken. This break-down held up the pulp mill for about six hours.

Baublitz went to work the next night but no one in authority mentioned the matter to him. The next day the superintendent asked him how the sprocket wheel had become broken. Baublitz replied that he did not think it was his fault and that it had not broken down during his shift. He further said that he had left his helper in charge at the time he went to the locker room. The superintendent laid him off for a week. Baublitz advised his foreman of this, giving the latter the further information, that his wife had given birth to a baby the day before, that his mind was not on his work and saying that he was going home. Following this, he went home some three hours before the end of his shift. The next week he was demoted from operator to laborer in the yard at a 10% reduction in pay. The testimony showed that sprockets had previously been broken but no operator had ever been disciplined as a result thereof. It is conceded that Dubbs, whom Baublitz said he left in charge and who actually went from the digester room, leaving no one there, just before the conveyor became jammed and the sprocket wheel broken, was not punished in any way. Instead, he was given Baublitz' position as operator. After Roy Baublitz had been laid off, his father had a talk with a foreman under whom the son worked every third week. The foreman said, "They shouldn't have laid him off. We could always depend on him." George Baublitz replied, "Mummert (an employee) and Andy (the superintendent) is the fellows who got him for union activitiy." The foreman answered, "Yes."

■ At the time the above incidents happened, Baublitz was the only one of the three original union organizers re-

maining in the employ of the petitioner. He had openly worked for the union for a number of months and the president of the concern, as noted, had indicated disproval of his activity to Baublitz' father. In view of all the facts and circumstances of the conveyor incident, there was substantial evidence for the Board to find as it did that "the real reason" for Baublitz' layoff and demotion was "his membership in and activity on behalf of the Union," and holding that thereby petitioner discriminated against him in regard to the hire and tenure of his employment in violation of Section 8 (3) of the Act.

The Board also found that the petitioner had interfered with, restrained and coerced its employees in the exercise of their rights under Section 7 of the Act, 29 U.S.C.A. § 157, thereby violating Section 8 (1) of the Act, namely, being unfair with respect to its employees' rights of self organization. The basis of this finding consists of the matters in connection with Roy Baublitz and three other incidents. The first two of these latter arise out of a union organizational meeting planned for the evening of October 6, 1942, at the home of Albert Spahr, a then employee of the petitioner. On two different occasions during that day, two of the plant foremen separately inquired of Spahr why they were not invited to his "party" that evening. After the close of the work day, Spahr overheard the president of the concern make some reference about the meeting, to one of the employees. Spahr asked the president, what the trouble was. The president replied, "Spahr, you are pretty tight with your invitations, aren't you? I like parties; why don't you give me an invitation?" The next day one of the foremen who had questioned Spahr about his "party," curtailed the latter's smoking privileges, telling him in the presence of two fellow workers that he "had orders" that thereafter Spahr would not be allowed to smoke during working hours in the shipping office or on the loading platform. The practice was for employees to smoke in these two places. The two employees with Spahr were specifically exempted from this ruling.

The third incident happened late in January, 1943. A prospective employee named Preston Meyers was interviewed by the personnel director in connection with his application for employment. The director inquired where Meyers had previously

worked. Meyers named a company in which a labor organization was active. The director stated that he was "leery about hiring those fellows down there" and asked Meyers if he "belonged to any organization." Meyers replied that he did not. Shortly thereafter, Meyers joined the union and wore a union button in the plant. The personnel director sent for Meyers, reminded him that when he had applied for employment he had stated that he did not belong to any organization, saying, "I despise a liar more than I do a thief because I can watch a thief."

█ The testimony and the facts surrounding it support the Board's finding that the inquiries by the president and the two foremen, of Spahr, concerning the union meeting at the latter's home, interfered with his right of self-organization. H. J. Heinz Company v. National Labor Relations Board, 311 U.S. 514, 61 S.Ct. 320, 85 L.Ed. 309, involved a quite similar situation. In that case the present Chief Justice, then Justice Stone, said at page 518 of 311 U.S., at page 322 of 61 S.Ct., 85 L.Ed. 309: "All three (foremen of the Company) spoke disparagingly of the Union, one at a meeting of employees which he had called; *and two were active in questioning employees concerning their labor union sympathies.* (Italics ours.) Two of them threatened employees with discharge or loss of work or privileges if the Union were recognized."

And at page 520, of 311 U. S., at page 323 of 61 S.Ct., 85 L.Ed. 309: "We do not doubt that the Board could have found these activities to be unfair labor practices within the meaning of the Act if countenanced by petitioner, and we think that to the extent that petitioner may seek or be in a position to secure any advantages from these practices they are not any the less within the condemnation of the Act because petitioner did not authorize or direct them."

In National Labor Relations Board v. Alco Feed Mills, 5 Cir., 133 F.2d 419, a foreman had taken his time book and asked each millhand whether he was signed up with the union, noting by a mark on the book the answer, but making no threat or comment. Referring to this questioning of employees on union activity, Judge Sibley, speaking for the Fifth Circuit, said, 133 F.2d at page 421: "But

the act of Frazier (the foreman) on Nov. 12 in polling the men touching their union connection and recording it on the timebook in their presence, was the act of the Company, and may have implied a threat of some action to come. It is evidence of interference. Because of it the order to cease and desist from interference is supported."

The language in Gamble-Robinson Co. v. National Labor Relations Board, 8 Cir., 129 F.2d 588, is appropriate here with reference to the questioning of Meyers. After detailing various acts of supervisory employees intended to interfere with unionization, and concluding that from them the employees would realize that the employer was actively opposed to unionization, the Court said at page 591 of 129 F.2d: "Especially is this conclusion inevitable when it appears that upon hiring new employees they are asked about their association with or ideas concerning unions." Both on the discrimination against Spahr by rescinding the customary smoking privileges because of his participation in the union meeting at his home, and on the corporation president's comment to George Baublitz that the latter's son would "find himself in trouble" because of his association with the union organizer, the case of Valley Mould & Iron Corp. v. National Labor Relations Board, 7 Cir., 116 F.2d 760, is illuminative. There, Cook, the president of the union, was at first threatened with the loss of his job and later subjected to discriminatory treatment. Judge Lindley, in detailing these events, said at page 762 of 116 F.2d: "Cook then volunteered that the men would not be satisfied with the Representation Plan and Swab (Vice-president of the employer) said, 'If this business is not stopped, somebody is going to be asked to take a vacation.' As he was looking to Cook, the latter remarked, 'I presume that's me.' Swab said nothing further."

Later, a strike was called, and a few days after its termination, Cook found that his free day had been changed from Sunday to Tuesday. Cook, having seniority, had been allowed Sundays off for four years prior to the strike. The court in condemning these practices, said at page 764 of 116 F.2d: "The act was intended to secure and preserve for employees the right to bargain collectively without intimidation, coercion or other improper in-

fluence from anybody, whether it be employer, labor unions or others. The purpose of the legislation and its proper administration necessitate, upon the part of the employer, the utmost of honest neutrality upon his part. * * * The whole end in view is free, untrammeled, uninfluenced self-determination of a bargaining agent."

The authority of the Board under Section 10 (c) of the Act, 29 U.S.C.A. § 160 (c), to hand down such an order as the present one, was upheld by the Supreme Court in National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc., 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307. With reference to Roy Baublitz, reinstatement is the "conventional correction" in such a case. Phelps Dodge Corp. v. National Labor Relations Board, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271, 133 A.L.R. 1217.

A decree will be entered enforcing the order of the Board.