**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**GREAT DANE TRAILERS, INC., Respondent.**

No. 22427.

United States Court of Appeals
Fifth Circuit.

June 24, 1966.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., Elliott Moore, Atty., N. L. R. B., Washington, D. C., for petitioner.

O. R. T. Bowden, Jacksonville, Fla., for respondent.

Before RIVES and GEWIN, Circuit Judges, and ALLGOOD, District Judge.

GEWIN, Circuit Judge:

This case is before the Court upon the petition of the National Labor Relations Board (Board) for enforcement of its order issued against Respondent, Great Dane Trailers, Inc. (Company) to cease and desist from certain activities found by the Board to be violative of Section 8(a) (3) and (1) of the National Labor Relations Act, 29 U.S.C.A. § 158(a) (3) and (1). The case is reported at 150 NLRB No. 55.

For a number of years the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, Local No. 26, AFL–CIO (Union) has been the collective bargaining representative of the employees at the Company's Savannah, Georgia, plant. The last contract between the Union and the Company was effective by its terms until March 31, 1963, and from thereafter until unilateral termination by either party upon 15 days notice. The contract contained the following pertinent provisions:

"(a) Each qualified employee covered by this agreement shall be entitled after one (1) year of continuous employment, at a time agreeable to the Company, to a vacation of seven (7) consecutive days with pay for forty (40) hours at the rate of pay existing for such employee at the time of the beginning of his vacation. Each employee after five (5) years continuous service, shall be entitled to a vacation of fourteen (14) consecutive days, with pay for eighty (80) hours. Any employee entitled to a vacation with pay may waive the right, if his services are needed by the employer, to such vacation during the period of this agreement, and in such cases shall be entitled to receive in lieu thereof, at the time he becomes entitled to the vacation, the amount of vacation pay such employee would otherwise have received over and above the wages re-

ceived for work performed during the vacation period.

"(b) To qualify for said vacation, it is necessary that an employee shall have worked a total of fifteen hundred twenty-five (1525) hours in the said year; any time lost, however, because of an industrial accident while employed by this Company to count as part of the qualifying time.

"(d) Employees who have served less than sixty (60) days on the next July 1 after date of employment will receive no vacation pay on that date but on the following July 1 will receive the vacation due in accordance with the above qualifying requirements, plus extra amount due in accordance with hours worked.

"(e) In case of lay-off, termination or quitting, employee who has served more than sixty (60) days shall receive pro rata share of vacation.

"(f) All vacation pay shall be paid on Friday nearest July 1st, except as outlined in paragraph (d)."

On April 30, 1963, the Union gave notice terminating the contract, and on May 16 approximately 348 of the Company's 400 employees went on strike.

On July 12, 1963, a large number of striking employees demanded vacation pay allegedly due them under the provisions of the contract quoted above. The Company responded that since the formal contract with the Union had been terminated, it had unilaterally altered Company "policy" regarding vacation pay and that only those employees who were on the job July 1 of that year would receive any benefits. In the case of returning employees who had not been replaced, there was no break in service. The Company emphasized that while it had adopted substantially all of the vacation pay provisions of the prior contract, it was not granting vacation pay pursuant to that contract. It is admitted that vacation benefits were actually paid to all employees who met the contract qualifications but either did not strike on May 16, or abandoned the strike and returned to work before they were replaced.

In October 1963, the Union filed a complaint with the Board charging the Company with violation of Section 8(a) (3) and (1) of the Act by refusing to grant vacation pay due the striking employees under the terms of the contract because of their adherence to the Union's strike.

During the subsequent hearing before the trial examiner, the Company took the position that the contract giving the employees the right to vacation pay was no longer in effect and that even if it were still in effect, the Board could not properly exercise its jurisdiction to construe and enforce its terms, since such jurisdiction rests in state and federal courts by virtue of Section 301 of the Labor Management Relations Act, 29 U.S.C.A. § 185(a).[1] The hearing examiner concluded that the refusal to give vacation pay constituted a Section 8(a) (3) and (1) violation and recommended an order requiring the payment of such benefits. The Board reviewed the proceedings and adopted the conclusions of the trial examiner for the following reasons:

"We agree with the Trial Examiner that the denial of vacation pay to strikers who had not abandoned the strike by July 1, 1963, unlawfully discriminated against them because of their adherence to the Union's strike. Whether vacation pay was granted to those employees who were actually working on July 1, pursuant to the provisions of the expired contract, or was granted, as the Employer contends, as a unilaterally adopted policy formulated after the expiration of the contract, is immaterial. Any striker

---

[1]. § 185(a):
 "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."

who had yet been permanently replaced was entitled, as an employee under Section 2(3) of the Act, to be treated in the same fashion as other employees. And even those strikers who had been permanently replaced before the date of payment of vacation benefits were entitled to a pro-rate share, either under Article VIII(e) of the expired contract, or under the unilateral policy of the Employer which admittedly adopted substantially the same provisions on eligibility."

The Company here contends the Board erred because (1) its decision and order were necessarily grounded upon the construction of a collective bargaining agreement, and enforcement by the Board of a labor contract is contrary to the policies of the Act; and (2) alternatively, there was insufficient evidence to sustain the finding that the Company was motivated by anti-union sentiment in refusing to distribute the vacation pay benefits allegedly owed the striking workers.

 We first turn to the question of whether the Board acted improperly by exercising its jurisdiction over this matter. The Company has consistently asserted that its policy of granting vacation pay is a purely unilateral action taken without any reference to the now-terminated collective bargaining contract. It is undisputed that such a "policy" is a "term or condition of employment" as described by Section 8. Those striking employees who had not been replaced are definitely "employees" within the meaning of Section 152(3) of 29 U.S.C.A.[2] Therefore, if it is alleged that the Company discriminated between striking and non-striking "employees" in regard to the "term or condition of employment" as proscribed by Section 8(a) (3) and

(1), the Board clearly acted properly in exercising its authority to hold an inquiry and effect an appropriate remedy, if one is warranted, since this is an unfair labor practice charge in simplest terms. Thus, we can disregard the question of whether the Board *would* have acted improperly in exercising its jurisdiction to decide whether it was an unfair labor practice to withhold benefits due *under the contract*,[3] or whether such action would have violated the policies of the Act.

We next turn to the substantive issue of whether the Board had sufficient evidence to conclude the Company was motivated by anti-union sentiment in withholding vacation pay in violation of

Section 8(a) (3) and (1). As the Supreme Court said in American Shipbuilding Co. v. N. L. R. B., 380 U.S. 300, 85 S.Ct. 955, 963, 13 L.Ed.2d 855, 863, (1965):

"Section 8(a) (3) prohibits discrimination in regard to tenure or other *conditions of employment* to discourage union membership. Under the words of the statute there must be both discrimination and a resulting discouragement of union membership. It has long been established that a finding of violation under this section will normally turn on the employer's motivation. See Labor Board v. Brown, 380 U.S. 278 [85 S.Ct. 980, 13 L.Ed.2d 839]; Radio Officers' Union v. Labor Board, 347 U.S. 17, 43 [74 S.Ct. 323, 98 L.Ed. 455, 478, 41 A.L.R.2d 621]; Labor Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 46 [57 S.Ct. 615, 628, 81 L.Ed. 893, 916, 108 A.L.R. 1352]."

Furthermore, the Court has required an *"affirmative"* showing by the Board of unlawful "motivation," Local 357, Inter-

---

2. The Record shows that as many as 75% of the striking employees had been replaced by July 1.

3. The Company contends that the Board "changed horses" on the jurisdictional question since the *complaint* alleged that the unfair labor practice arose by failure to pay benefits due *under the contract*.

Parties to an unfair labor practice charge are not to be held to strict rules of pleading, since the purpose of the complaint is merely to set in motion the machinery of an inquiry. N.L.R.B. v. Fant Mill Co., 360 U.S. 301, 3 L.Ed.2d 1243 (1959); N.L.R.B. v. W. R. Hall Distributor, 341 F.2d 359 (10 Cir. 1965).

national Brotherhood of Teamsters v. N. L. R. B., 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11 (1961); and, as we have often said, "[a]n unlawful purpose is not lightly to be inferred," N. L. R. B. v. McGahey, 233 F.2d 406 (5 Cir. 1956).

■ The sole act of the Company upon which the Board made its finding of anti-union sentiment was the refusal to pay the vacation benefits. In effect, the Board held this act to be an ipso facto, per se violation. There was no supporting evidence whatsoever. To the contrary, the Board itself adopted the hearing examiner's conclusion in favor of the Company in a companion 8(a) (1) charge. There was also evidence presented in the hearing that the Company had gone to some lengths to *avoid* illegal employee pressuring.[4] Moreover, the Company contends it has never before been involved in an unfair labor practice controversy, and there is no record evidence that it has ever been so involved. We can narrow the question, therefore, to whether the act of withholding the benefits is *by itself* sufficient evidence of unlawful motive. The Supreme Court confronted substantially the same issue in *American Shipbuilding,* supra, and stated the following at 85 S.Ct. 963, 13 L.Ed.2d 863, 864:

> "But we have consistently construed the section to leave unscathed a wide range of employer actions taken to serve legitimate business interests in some significant fashion, even though the act committed may tend to discourage union membership. See, e. g., Labor Board v. Mackay Radio & Telegraph Co., 304 U.S. 333, 347 [58 S.Ct. 904, 911, 82 L.Ed. 1381, 1391]. Such a construction of § 8(a) (3) is essen-

tial if due protection is to be accorded the employer's right to manage his enterprise. See Textile Workers v. Darlington Mfg. Co. [380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827].

"This is not to deny that there are some practices which are inherently so prejudicial to union interests and so devoid of significant economic justification that no specific evidence of intent to discourage union membership or other antiunion animus is required. In some cases, it may be that the employer's conduct carries with it an inference of unlawful intention so compelling that it is justifiable to disbelieve the employer's protestations of innocent purpose."

Thus, we must decide whether the Company's withholding of vacation pay "carries with it an inference of unlawful intention *so compelling* that it is justifiable to disbelieve the employer's protestations of innocent purpose." (Emphasis added.) We find that it does not. Based upon the term "so compelling", we conclude that if the "employer's conduct" carries with it *any other* reasonable inferences of a *legitimate motive,* the inference of illegality does not control. Although the record does not reveal any such alternative motives, we find it reasonable to infer that the Company might have acted (1) to reduce expenses; (2) to encourage longer tenure among present employees; or (3) to discourage early leaves immediately before vacation periods. We see nothing irregular about the failure of the Company to come forward with such evidence, although it might have benefitted their cause. The burden of proving motivation is on the Board. N.L.R.B. v. McGahey, supra, 233 F.2d at 411.[5] When viewed in the light

---

4. The Hearing Examiner reported the following in his Decision:

"Docie [Personnel Manager of Company] testified that when the strike began, he was instructed by Company Counsel not to solicit any employee to return to work, or to make any promises regarding 'fringe benefits or any favoritism'; that he followed these instructions 'implicitly.'"

The Trial Examiner credited this testimony.

5. As we stated in McGahey, 233 F.2d at 411:

"Each was a perfectly sufficient explanation for the discharge of the particular employee and would itself sustain the burden, if it rested upon the employer, that the discharge of each was for the stated reasons. But the employer

of the strong evidence showing otherwise exemplary conduct on the part of the Company during the strike, the argument favoring the inference of illegality becomes increasingly weaker.

There remains the question, whether judged by the standards announced in Oil City Brass Works v. NLRB, 357 F.2d 466 (5 Cir. 1966), there is substantial evidence in this record as a whole to support a factual finding that these acts were improperly motivated.

This case may be compared to Bi-Rite Foods, Inc., 1964 CCH NLRB Cases ¶ 12,132, 147 N.L.R.B. 59 (1964). In that case the company offered certain benefits but the Union turned them down, electing instead to strike. "The employer sent a letter to strikers, giving the date he would replace strikers if they did not return. He also stated that on that date he would put into effect the wage, holiday, and vacation offer, he made before the strike. Eight or nine strikers out of the twenty-eight or twenty-nine returned to work, and the employer put the changes into effect." 1964 CCH NLRB Cases ¶ 13,132 at 20, 941. The conduct in Bi-Rite Foods, Inc. was held not to constitute a refusal to bargain and, thus, not to be an unfair labor practice.

In the instant case essentially the same type of conduct took place. The terms of the vacation pay agreement were essentially the same as those the Union turned down as insufficient when it terminated the old contract. The fact that they applied only to employees who returned to work by July 1 is no more coercive than the implementation of new benefits in *Bi-Rite Foods, Inc.* In fact, it was not until July 12 that it became apparent the company would not pay the allegedly due benefits.

At the time the company refused to pay, a real question existed as to whether the replaced employees were entitled to those benefits. Two means existed for settling that issue. One, the Union could have bargained over the exact rights of employees. Two, the employees affected could have brought suit under section 301.

This is not a refusal to bargain, but is a case where the employer was accused of discouraging union membership. Certainly its assertion of a contested right in this case is no more coercive than the replacing of economic strikers. Yet no one could contend that that violated section 8(a) (3) and (1).

This Board proceeding is devoid of circumstantial evidence on which to base an inference of improper motive. Nor is this the type of situation which the Board has seen so often that it can draw on a background knowledge of what is the usual intent of the employer. The complete absence of any primary facts on which an inference of improper motive can be based requires the conclusion that there is no substantial evidence in the record as a whole to support the Board's finding.

Having concluded, therefore, that there are insufficient facts shown by the record to support an inference of unlawful motivation, and that there is no substantial evidence in the record as a whole to support the conclusion that the Company violated Section 8(a) (3) and (1) of the Act, the petition for enforcement is denied.

does not bear this duty. It is, rather on the General Counsel to establish by acceptable substantial evidence on the whole record that discharge came from the forbidden motives of interference in employee statutory rights. The burden long imposed by this Court, N.L.R.B. v. Miami Coca-Cola Bottling Co., 5 Cir., 222 F.2d 341; N.L.R.B. v. Brady Aviation Corp., 5 Cir., 224 F.2d 23; N.L.R.B. v. Alco Feed Mills, 5 Cir., 133 F.2d 419; N.L.R.B. v. Tex-O-Kan Flour Mills, 5 Cir., 122 F.2d 433; N.L.R.B. v. Ray Smith Transport Co., 5 Cir., 193 F.2d 142, has added sanction by express terms of the Act."