**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**RAYMOND PEARSON, Inc., Respondent.**

**No. 16162.**

United States Court of Appeals, Fifth Circuit.

April 2, 1957.

Morris A. Solomon, Trial Atty. NLRB, Marcel Mallet-Prevost, Asst. Gen. Counsel, NLRB, Washington. D. C., Theophil C. Kammholz, Gen. Counsel, Washington, D. C., Frederick U. Reel, for National Labor Relations Board.

Leroy Jeffers, Houston, Tex., Vinson, Elkins, Weems, & Searls, Houston, Tex., of counsel, for respondent.

Before RIVES, TUTTLE and BROWN, Circuit Judges.

RIVES, Circuit Judge.

The National Labor Relations Board petitions this Court for enforcement of its decision and order reported at 115 N. L.R.B. No. 31. The respondent is engaged in the retail selling and servicing of Ford automobiles at Houston, Texas, employing some 96 nonsupervisory and nonclerical employees, mostly automobile mechanics. Its principal stockholder is Raymond Pearson, often referred to in the proceedings as Colonel Pearson, and its service manager charged with supervision over the mechanics in its shop is B. G. Sweeney. The Board found that respondent violated Section 8(a) (1) of the Act[1] by the conduct of its service manager Sweeney in interrogating employees concerning union activities and

affiliations, in threatening and warning employees to refrain from assisting, joining or remaining members of the union, and in suggesting that the employees revive an old company union and offering aid for such revival. The Board further found that respondent violated Section 8(a) (3)[2] and (1) of the Act by discharging employee A. H. Gullick because of his union activities and leadership.

An organizational campaign was commenced by the union among respondent's nonsupervisory and nonclerical employees in May, 1954. On July 2nd, the union requested the respondent to recognize it as representing a majority of such employees. Respondent refused. On July 7th, the union filed representation petition with the Board seeking certification. On August 3rd, a hearing was held on the union's petition, and Gullick and two other employees attended the hearing as employee-observers for the union. On August 16th, respondent discharged Gullick allegedly for "flat-rating" an inspection job. On September 27th, the Board directed the election, and on October 22nd the union was defeated by a vote of 51 to 36.

There is, and can be, no serious contention that the 8(a) (1) violation based on the conduct of service manager Sweeney in interrogating and threatening employees with respect to their union activities and offering to assist in the formation of a company union is not supported by substantial evidence on the record as a whole. Eight different employees testified to separate instances of such threats, interrogations, or assistance, and, of course, Sweeney's denial of the statements attributed to him simply raised an issue of credibility as to which the findings of the Trial Examiner and of the Board will be accepted.

1. "§ 158. Unfair labor practices
   "(a) It shall be an unfair labor practice for an employer—
   "(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title; * * *." 29 U.S.C.A.

2. 29 U.S.C.A. § 158(a) (3):
   "(a) It shall be an unfair labor practice for an employer—
   *   *   *   *   *
   "(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization * * *."

The serious defense offered to the 8(a)(1) violation is that those parts of the complaint were barred by the six-month period of limitation provision of Section 10(b) of the Act.[3] The original charge was filed and served on respondent on August 27, 1954, and stated the basis of the charge as follows:

"On or about August 16, 1954, it, by its officers, agents and employees, terminated the employment of A. H. Gullick, a mechanic, because of his membership and activities in behalf of the International Association of Machinists, A. F. of L. a labor organization, and at all times since such date, it has refused and does now refuse to employ the above named employee.

"*By the acts set forth in the paragraph above, and by other acts and conduct, it by its officers, agents and employees, interfered with, restrained and coerced its employees in the exercise of the rights guaranteed in Section 7 of the Act.*" (Emphasis supplied.)

Amended charges were filed and served on September 17, 1954, October 2, 1954, and March 19, 1955, respectively, alleging discriminatory discharges of other employees, and containing also the language emphasized in our quotation from the original charge. Purportedly upon the basis of such charges, the General Counsel of the Board issued a complaint against respondent on June 10, 1955, alleging inter alia that:

"Respondent, through its officers, agents, and employees, particularly B. G. Sweeney, service superintendent, from on or about July 1, 1954, to date, has interrogated its employees concerning their union affiliations; has threatened and warned its employees to refrain from assisting, becoming members of or remaining members of, the unions; and more particularly, * * *."

During the course of the hearing, the General Counsel was permitted to amend the complaint over respondent's objections by adding other specifications of threats of reprisal and interrogation of the same general kind by Sweeney, all occurring after July 1, 1954, and within six months prior to the filing and service of the original and first two amended charges.

■ It is familiar procedural law in cases of this kind that the complaint is the first technical "pleading," and that the charge simply sets in motion the investigation to determine whether or not the complaint shall issue. Technical precision is not, therefore, required in the charge, and it is sufficient if it informs the alleged violator of the general nature of the violation charged against him and enables him to preserve the evidence relating to the matter.[4]

■ The part which has been heretofore quoted with emphasis from the original charge notified the respondent that it was charged not only with the wrongful discharge of the named employee, but with "other acts or conduct"

3. 29 U.S.C.A. § 160(b), reading in pertinent part:
"(b) Whenever it is charged that any person has engaged in or is engaging in any such unfair labor practice, the Board or any agent or agency designated by the Board for such purposes, shall have power to issue and cause to be served upon such person a complaint stating the charges in that respect * * *: *Provided*, That no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board

and the service of a copy thereof upon the person against whom such charge is made * * *. Any such complaint may be amended by the member, agent, or agency conducting the hearing or the Board in its discretion at any time prior to the issuance of an order based thereon. * * *."

4. N. L. R. B. v. Indiana & Michigan Electric Co., 318 U.S. 9, 18, 63 S.Ct. 394, 87 L.Ed. 579; N. L. R. B. v. Tex-O-Kan Flour Mills Co., 5 Cir., 122 F.2d 433, 437.

which "interfered with, restrained and coerced its employees in the exercise of the rights guaranteed in Section 7 of the Act." This amounted, almost in the words of the statute, to a charge of a violation of Section 8(a) (1) of the Act by "other acts or conduct" than that specified in the charge. Respondent's attempted recourse to the rule of *ejusdem generis* is deprived of its force by the fact that the alleged discriminatory discharges in violation of both 8(a) (1) and 8(a) (3) carried more serious possible consequences to the respondent than did the simple 8(a) (1) violations. Moreover, evidence of the 8(a) (1) violations would probably have been admissible to prove the wrongful motive for such discharges. We hold, therefore, that the original and amended charges formed sufficient basis for the issuance of those parts of the complaint alleging 8(a) (1) violations, and, hence, that they were not barred by the six-month period of limitation of Section 10(b) of the Act.[5]

Gullick was the employee most active in the union's solicitation activities. It was natural, therefore, to suspect that his discharge within two weeks after he had attended the representation hearing as an employee-observer for the union was in reality based upon his union activities. However, Gullick was admittedly guilty of "flat-rating"[6] an inspection job, for which respondent purportedly discharged him, and if that was respondent's actual motive Gullick's discharge was lawful.[7] The question then is whether the Board's finding of the unlawful motive is supported by substantial evidence on the record considered as a whole.[8]

The offense for which the respondent claimed to have discharged Gullick was a serious one, amounting to collecting compensation from the respondent wrongfully for work not actually performed, and, equally serious, jeopardizing the good will and business reliability of the garage by passing the charges on to unsuspecting customers whose very safety might be imperiled as they continued to drive their automobiles think-

5. See N. L. R. B. v. Westex Boot & Shoe Co., 5 Cir., 190 F.2d 12, 13–14; N. L. R. B. v. U. S. Gypsum Co., 5 Cir., 206 F. 2d 410, 411–412; N. L. R. B. v. Talladega Cotton Factory, Inc., 5 Cir., 213 F. 2d 209, 215; N. L. R. B. v. McGahey, 5 Cir., 233 F.2d 406, 409; N. L. R. B. v. Newton, 5 Cir., 214 F.2d 472, 473–475; N. L. R. B. v. Vare, 3 Cir., 206 F.2d 543; N. L. R. B. v. I. B. S. Mfg. Co., 5 Cir., 210 F.2d 634; Joanna Cotton Mills Co. v. N. L. R. B., 4 Cir., 176 F.2d 749.

6. The term "flat-rating" is shop parlance denoting the performance of a job carrying a "flat" price without going through all the steps specified in the manual, although the customer or the employer is charged, and the employee is compensated, at the same "flat" rate that would apply if all the specified steps had been taken. A distinction is drawn between legitimate "flat-rating" (accomplishing the basic objective of the job without going through all the specified manual operations) and illegitimate "flat-rating" (omitting a necessary element of the job). Gullick was guilty of the illegitimate type of flat-rating.

7. As commented by the Trial Examiner during the course of the hearing:
"I think all of that testimony does go to support the finding that in truth and in fact Gullick did not drop the pans, but that is admitted by Gullick. That is not the issue here. I think that the question—it is true that the Respondent had a perfect right to discharge him for that, but the question is, was that the real reason, or does the evidence support a finding that it wouldn't have discharged him for that alone were it not for his union activities. That is the issue in the case. And that is why we have to come back to the claim of Mr. Latimer which may or may not be supported by the record that other employees were allowed to get away with it and they were just trying to trap Gullick to get something on him so they could discharge him."

8. Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 475, 487, 488, 71 S.Ct. 456, 95 L.Ed. 456; N. L. R. B. v. Coats & Clark, Inc., 5 Cir., 231 F.2d 567, 572; N. L. R. B. v. McGahey, 5 Cir., 233 F.2d 406, 413; N. L. R. B. v. The Newton Co., 5 Cir., 236 F.2d 438; N. L. R. B. v. Fox Mfg. Co., 5 Cir., 238 F.2d 211.

ing that they had been properly repaired or serviced. Cf. N. L. R. B. v. Blue Bell, 5 Cir., 219 F.2d 796, 798. Sweeney had learned somewhat accidentally from another employee of the wrongful flat-rating practice. He set out to discover which employees were guilty, and Gullick was the first one whom he discovered. Apparently, the practice then stopped. We do not think that the record supports the inference that he laid a trap for Gullick. He reported the facts truthfully to Colonel Raymond Pearson who made the decision to discharge Gullick. Pearson testified that, "I told him if the facts were as he stated that we had no alternative but to let the man go." When Gullick came to see Pearson to ask for another chance, Pearson told him, "If we don't fire you for that, we can never fire anybody for flat-rating, and you know we can't run a first-class reputable shop, if that sort of thing goes on." Subsequent checking of the records as to the number of gaskets that Gullick had drawn from the parts department revealed that Gullick had flat-rated probably as many as eighteen inspection jobs during July and August, for which he had received $76.15 in compensation not earned. After learning that, Colonel Pearson refused to reinstate Gullick, testifying, "We had no alternative but to let the discharge stand." The Trial Examiner considered Pearson a candid, truthful witness. Without going further into detail, we think that the grounds upon which the Trial Examiner and the Board held that Gullick's discharge was unlawfully motivated are not supported by substantial evidence on the record considered as a whole.

That part of the order directing the respondent to take affirmative action on account of the alleged wrongful discharge of A. H. Gullick is therefore denied enforcement, and that part of the order directing the respondent, its officers, agents, successors and assigns to cease and desist from violating Section 8(a)(1) of the Act is enforced.

Enforced in part and denied in part.