NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

WALTON MANUFACTURING COMPANY and Loganville Pants Company, Respondents.

No. 18198.

United States Court of Appeals Fifth Circuit.

Jan. 6, 1961.

See also, 5 Cir., 286 F.2d 26.

Russell Specter, Atty., Marcel Mallet-Prevost, Asst. Gen. Counsel, Thomas J. McDermott, Associate Gen. Counsel, Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Allison W. Brown, Jr., Atty., N. L. R. B., Washington, D. C., for petitioner.

Robert T. Thompson, Alexander E. Wilson, Jr., Atlanta, Ga., Wilson, Branch & Barwick, Richard N. Hubert, Atlanta, Ga., of counsel, for respondents.

Before JONES, Circuit Judge, and HOOPER and JOHNSON, District Judges.

JONES, Circuit Judge.

The National Labor Relations Board, by this proceeding, seeks enforcement of its order [1] against the Respondents, Walton Manufacturing Company and Loganville Pants Company. The Board found that the Respondents interfered with, restrained and coerced their employees by surveillance of union activities, threatening reprisals for union adherence and interrogating employees concerning union affairs. The Board's order directs

1. 124 N.L.R.B. 1331.

that the Respondents cease and desist from engaging in these practices. The Board found that the Respondents had discharged four employees and terminated the employment of nine others because of their union activities. The Board's order directs that employment be offered to such of these discharged and terminated employees as had not been rehired and that all of them be made whole for any loss of earnings sustained by reason of their having been discharged or having had their employment terminated. The conventional provisions for making Respondents' records available to the Board, and for the posting of notices were included in the order. The Board states that the only question for our consideration is whether there is substantial evidence on the record as a whole to support the Board's findings. This is certainly important and may be controlling.

As we must do in these "substantial evidence" cases, we have undertaken the tedious task of reading the record and reviewing the evidence; tedious because of the necessity of going from the Board's appendix to the employer's appendix, and so back and forth from one to the other, in an effort to piece together the isolated excerpts of testimony which each party has extracted for the purpose of supporting the position for which it contends. The Board incorporates into its appendix nineteen separate quotations from the testimony of the witness, Morris Scharff, and the employer includes thirty-seven selections from the testimony of this witness. The same is also true, to a lesser degree, with respect to the testimony of twenty-five or more of the other witnesses. Our decision is to be based upon the record considered as a whole. Parts of the record, taken out of context, are not to be considered piecemeal, but we are to consider the record in its entirety and as a unit. This we have attempted to do.

The Board found that the Respondents interfered with, restrained and coerced their employees in violation of Section 8 (a) (1) of the Act.[2] The personnel matters of the Respondents were entrusted to Morris Scharff. That he was possessed of an anti-union bias is well established, and the Respondents are not to be penalized because of his beliefs. N. L. R. B. v. McGahey, 5 Cir., 1956, 233 F. 2d 406. Nor will the absence of affection of the union management for Scharff, which was also demonstrated, result in any benefit to the Respondents. Morris Scharff made talks to the employees during the period when the union was attempting to organize the Respondents' plants. He related some of his unpleasant experiences with the union during the time he was operating a plant in New York. In the brief of the Board it is stated that "Scharff told the employees, in effect, that he would shut down the plant rather than deal with the union." Although some of the witnesses for the Board's General Counsel testified that Scharff had made such statements, the Examiner became satisfied that the tape recordings, providentially made, and written transcriptions of them, were "substantially accurate reproductions of what was said. * * *" The Examiner concluded that the statements of Morris Scharff were, to use the phrase in the Examiner's report, "protected free speech," with the exception of the conclusion of the speech[3] in which Scharff said:

"* * * remember I have no association with this Company, officially. I hope to have in the near future, but if you want a union shop, you are going to have it without me, because I have had my stomach full of unions, because I can't take orders from New York. I can't take an order to be unfair to one person or another. I will have no part of it."

2. 29 U.S.C.A. § 158(a) (1).

3. Morris Scharff made several speeches, all from the same notes and all of substantially the same content.

■ Upon the above quoted statement the Examiner finds that Scharff had threatened to close the plant rather than deal with the union. Although the father and brother of Morris Scharff were officers, directors and stockholders of the Respondents, Morris Scharff himself was neither officer, director nor stockholder. We find no basis for an inference of a threat to close the plant in the statement of Scharff that if the employees have a union shop they will have it without him, and that he will have no part of it. Notwithstanding· the extent to which Morris Scharff may have exercised the functions of management, or have been regarded by the employees as the boss, that which he said cannot fairly be interpreted to mean something so different as the meaning which the Examiner has found. Some of the employees gave categorical testimony that Scharff's speeches did contain direct statements that he would close the plant rather than deal with the union. The Examiner concludes that this testimony was the interpretation of Scharff's quoted remarks, and the Examiner says that the employees did reasonably interpret the remarks as a threat to close the plant. If it be suggested that, instead of making reasonable interpretations, these employees merely demonstrated that they had faulty memories, and their statements as to other matters were to be regarded with suspicion, the answer to such a suggestion would be that credibility is a matter entrusted to the Examiner and the Board and they have fully credited the testimony of the employees and have found Morris Scharff unworthy of belief.

■ Although there was not any evidence, substantial or otherwise, to support the finding that Morris Scharff, in his talks to employee groups, threatened to close the plants, we cannot say the same with respect to other findings of interference, restraint and coercion. A letter was sent to employees outlining the Respondents' policy as to life insurance, hospital and medical insurance, paid vacations and overtime. Hope of inaugurating a pension plan was declared. The letter stated:

"We are happy that no employee has to pay dues or initiation fees to any outside union to work at these plants. You will not be forced to make payments to outsiders for the privilege of working here. What earnings you make here are yours. No part goes to organizers."

A union organizer was followed as he called upon Respondents' employees at their homes. Direct as well as veiled threats of discharge for joining the union were made by a supervisor to employees. There was interrogation by supervisors of employees as to their activity and that of others with respect to the union. The testimony as to some of these matters was controverted. The resolving of evidentiary conflicts is within the province of the Board. Some of the conduct of the Respondents which the Board has condemned might, if isolated from the other facts shown, be regarded as not being in violation of the prohibitions against interference, restraint and coercion. We cannot say that the totality of the evidence, the substantial evidence on the record as a whole, fails to support the Board's finding of interference, restraint and coercion. The "cease and desist" portion of the Board's order, modified as hereinafter provided, will be enforced.

Among other things, the Board's order provides that the Respondents shall cease and desist from:

"Discouraging membership in and activities on behalf of Amalgamated Clothing Workers of America, AFL-CIO, or in any other labor organization of its employees, by *discharging or refusing to reinstate any of its employees, or in any other manner* discriminating in regard to their hire or tenure of employment, or any other term or condition of employment." [Italics supplied.]

Since, as is hereinafter set out, it is determined that substantial evidence is lacking for the Board's findings that the

Respondents discriminatorily discharged and refused to rehire employees because of their union activity, we reach the conclusion that the italicized portion of the order, as quoted above, should be omitted.

■■ The Board's order also directed the Respondents to cease and desist from:

"Following or otherwise engaging in surveillance of union organizers, or *creating the impression of* engaging in surveillance of union meetings; threatening employees with discharge, shutdown of the plant or with other economic sanctions to discourage union affiliation or adherence; coercively or otherwise unlawfully interrogating employees regarding their union membership or activities; conditioning the reemployment of laid off employees upon a union not becoming the representative of the employees; or in any other manner interfering with, restraining or coercing employees in the exercise of the right to self-organizations, to join or assist Amalgamated Clothing Workers of America, AFL-CIO, or any other labor organization, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection as guaranteed in Section 7 of the Act and to refrain from any and all such activities, except to the extent that such rights may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in Section 8(a) (3) of the Act." [Italics supplied.]

If the Respondents are required to refrain from engaging in surveillance of union meetings the purpose of the Act will be served without imposing upon them a duty to avoid creating an impression. "Impression" is an equivocal term, it is "an indistinct or indefinite notion, remembrance, belief, or opinion." Paramount Film Distributing Corporation v. City of Chicago, D.C.N.D.Ill.1959, 172 F. Supp. 69, 72. Unlawful interference may be found from inferences based on facts disclosed by evidence, but not upon impressions made upon the employees, unless made by acts or words of the employer, and then it is the acts or words that are violative of the law. The italicized words in that portion of the order last quoted above should be deleted.

■■ During the period between December 4, 1957, and January 16, 1958, the Respondents discharged four employees, Lucille Yancey, Grace McCart, Pearl Coker, and Ruth Brooks. The Board found that they were discharged for union activity, in violation of Section 8(a) (3) and (1) of the Act. Reinstatement of those who had not been rehired and payment of lost earnings were ordered. We are again confronted with the difficult task of determining whether the motive for the discharge of employees is a proper one or whether it was prompted by the activity of the employees on behalf of a union. Cf. N. L. R. B. v. Redwing Carriers, Inc., 5 Cir., 1960, 284 F.2d 397. The requirements of substantiality of evidence and reasonableness of the inferences to be drawn from the evidence are not less in a case of reinstatement and reimbursement than where a cease and desist order is directed against interference. See N. L. R. B. v. Ingram, 5 Cir., 1960, 273 F.2d 670; N. L. R. B. v. Tex-O-Kan Flour Mills Co., 5 Cir., 1941, 122 F.2d 433. In the determination of whether there is substantial evidence and whether inferences are justified, a closer scrutiny of the record than might otherwise be required becomes necessary where, as here, questionable inferences have been drawn and where, as here, the Examiner has uniformly credited all of the General Counsel's evidence and generally disbelieved all of the employer's evidence. N. L. R. B. v. Miami Coca-Cola Bottling Co., 5 Cir., 1955, 222 F.2d 341, Cf. N. L. R. B. v. Cosco Products Co., 5 Cir., 1960, 280 F.2d 905.

We are aware of the requirement that we are not to overturn the Board's findings if supported by substantial evidence on the record as a whole. We recognize the principle that the substantial evidence rule applies to the choice of inferences as well as to the finding of facts as facts. N. L. R. B. v. Birmingham Publishing Co., 5 Cir., 1958, 262 F.2d 2. We do not question the settled doctrine that the Court should not, as a general proposition, disturb the action of the Examiner and the Board in crediting or discrediting the testimony of a witness. N. L. R. B. v. West Point Manufacturing Co., 5 Cir., 1957, 245 F. 2d 783; N. L. R. B. v. The Newton Co., 5 Cir., 1956, 236 F.2d 438. It is not, however, required that the Examiner's findings be given more weight than reason would dictate and, in the light of judicial experience, they deserve. Universal Camera Corporation v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. This Court has had frequent occasion to announce and develop the doctrine that if it appears that there is substantial evidence on the record as a whole to make the inferences of legal and illegal discharge reasonably equal, we may not overturn the Board's finding of an illegal discharge. N. L. R. B. v. Dan River Mills, Inc., 5 Cir., 1960, 274 F.2d 381; N. L. R. B. v. Fox Manufacturing Co., 5 Cir., 1956, 238 F.2d 211; N. L. R. B. v. The Newton Co., 5 Cir., 1956, 236 F.2d 438; N. L. R. B. v. McGahey, 5 Cir., 1956, 233 F.2d 406; N. L. R. B. v. Coats & Clark, Inc., 5 Cir., 1956, 231 F.2d 567; N. L. R. B. v. Houston Chronicle Publishing Co., 5 Cir., 1954, 211 F.2d 848. The clarification of this rule, as stated in the Houston Chronicle case, by the opinion in Coats & Clark, has not modified the principle that an unlawful motive is not lightly to be inferred. N. L. R. B. v. Dan River Mills, Inc., supra; N. L. R. B. v. Hudson Pulp & Paper Corporation, 5 Cir., 1960, 273 F.2d 660; N. L. R. B. v. Fox Manufacturing Co., supra.

The burden of proof rests upon the Board's General Counsel to establish by acceptable substantial evidence on the record as a whole that discharges came from the forbidden motive of interference in the exercise of the statutory rights of the employees. N. L. R. B. v. Winter Garden Citrus Products Cooperative, 5 Cir., 1958, 260 F.2d 913, and cases there cited. See also N. L. R. B. v. Birmingham Publishing Co., supra, and cases there cited, and N. L. R. B. v. Redwing Carriers, Inc., supra. Whenever the General Counsel's burden is not carried, and whenever the inferences of fact are not reasonably permitted by the substantial evidence, it is the duty of the reviewing court to displace the Board's finding of unlawful motive.

There was much evidence for the Respondents that the work of the discharged employees was unsatisfactory and that this was the sole reason for the discharges. Much of this testimony, of course, was from management, but like testimony was given by other employees and, it may be said, by the testimony in some instances of the discharged employees with respect to their own work. The first of the four employees to be discharged was Lucille Yancey whose employment was terminated on December 4, 1957. We are informed by the Board's brief that she "joined the union about ten days before her discharge and immediately became very active in its affairs." Her activity consisted of her receiving several visits from union organizers and promising to give the union a list of employees' names. It is not shown that this promise was kept. She did no soliciting of members for the union. She testified, and reiterated her testimony, that no union meetings were held until after her discharge. Since a union meeting was, in fact, held on the day before she was discharged, her testimony indicates both a lack of knowledge of the activities of the union and a lack of interest in such activities. She attended two meetings after she was discharged. The Board, in its brief, tells us that Mrs. Yancey told Morris Scharff, on the day of her discharge or the following day, that she would "abandon her union activities if she could return to her

job." What she said she told Scharff was that if he would give her back her job, "I won't vote for the union." At this interview Mrs. Yancey told Scharff that she had not been helping organize the plant. None of her superiors ever discussed the union with her while she was an employee. She quoted Scharff as telling her that he did not know whether she had signed a union card. It seems apparent that in the preparation of the Board's brief ardor has outrun accuracy.

Mrs. Yancey testified as to her skill as an operator and of the compliments she had received for her excellent work. The superintendent, I. S. Prosperman, the supervisor, Grace Higgins, and several of Respondents' employees testified otherwise. Of this testimony, the Examiner and the Board discredited, for the most part, that which was favorable to the Respondents and credited that which was unfavorable to them. It was pretty clear, though, that Mrs. Yancey had considerable trouble in sewing in the linings of coats. The Examiner was persuaded that this was not due to any lack of ability on the part of Mrs. Yancey, but rather to the skimpy cut of the linings. Mrs. Yancey admitted making the request for the linings to be cut longer, but only for the purpose of making it easier on her. Proper and satisfactory garments, she said, were being made with the linings as furnished. There was evidence, credible and credited, that Mrs. Yancey's work was not in all respects satisfactory. Applicable here are the following principles:

"The act does not interfere with the normal exercise of the right of the employer to select its employees or to discharge them. The employer may not, under cover of that right, intimidate or coerce its employees with respect to their self-organization and representation, and on the other hand, the Board is not entitled to make its authority a pretext for interference with the right of discharge when that right is exercised for other reasons than such intimi-

dation and coercion." N. L. R. B. v. Jones & Laughlin Steel Corporation, 301 U.S. 1, 57 S.Ct. 615, 628, 81 L.Ed. 893, 108 A.L.R. 1352. See N. L. R. B. v. McGahey, supra.

The Examiner has found that the Respondents knew or believed that Mrs. Yancey was a strong union adherent. The Board, in its brief, urges that "In view of respondents' demonstrated hostility to the union, and its surveillance of union activities, there was ample basis for the Board to find * * * that Yancey was known or believed by respondents to be an active union adherent, and that this was the reason for her discharge." The difficulty with the Board's position is that the evidence which the Examiner has credited, as well as that which he has discredited, shows that Mrs. Yancey was not at all active in her union adherence and no evidence, whether or not credited, tends to show otherwise. The visits of union organizers to Mrs. Yancey's home do not support a finding of union activity on her part. Nor does the anti-union feeling of the Respondents so change the character of the evidence as to require or permit the inference of wrongful discharge which the Examiner and the Board draw. The opposition of an employer to union organization, and restraint, coercion and interference are not enough to make the discharge of an employee a wrongful one. N. L. R. B. v. Hudson Pulp & Paper Corporation, supra; N. L. R. B. v. McGahey, supra. Anti-union bias, while a factor in evaluating testimony, does not supply the element of purpose. That element must be established with respect to each discharge. N. L. R. B. v. Dan River Mills, Inc., supra. The finding that Mrs. Yancey was discharged because of union activity was, it appears, based upon suspicion and conjecture. Such a finding, so based, cannot be sustained. N. L. R. B. v. Drennon Food Products Co., 5 Cir., 1959, 272 F.2d 23; N. L. R. B. v. Cosco Products Co., supra. We have the firm conviction that there is not substantial evidence on the record

as a whole that the discharge of Mrs. Yancey was wrongful.

We reach the same conclusion with respect to Grace McCart, Pearl Coker and Ruth Brooks as in the case of Mrs. Yancey. As to Mrs. McCart the evidence shows she attended a union meeting. There is no other evidence of union activity on her part. There was evidence of poor workmanship on her part. The conclusion is reached that because Morris Scharff was quoted as threatening to fire known union adherents, and because Scharff had asked her who attended the meeting, the discharge was the result of union activity. There was no firing of all union adherents, and the discussion between Mrs. McCart and Morris Scharff was initiated by her. She asserted that she was discharged because of union membership, a self-serving opinion which the Examiner and the Board accepted as fact. The Examiner stressed the fact that Mrs. McCart was rehired about a year later and then did satisfactory work, and from this fact draws the inference that she must have been doing satisfactory work before. While the doing of satisfactory work after the rehiring may justify an inference of an ability to do good work before being discharged, it does not demonstrate that she had done good work before being discharged.

Of the same pattern as Mrs. McCart were the discharges of Pearl Coker and Ruth Brooks. As with Mrs. Yancey, the Board's counsel says that the Board's finding of unlawful discharge of Pearl Coker is justified "in view of respondents' unconcealed animosity toward the union." That she was a sub-marginal producer is shown by her own testimony. Like Mrs. McCart, Pearl Coker was later rehired and from this the inference is again drawn that the work of the discharged employee must have been previously satisfactory. In the case of Ruth Brooks, from her own testimony, it appeared that she was unable to make production and had told Morris Scharff that she was not satisfied with her operation. She quoted him as saying that he also

was not satisfied. As in the case of Mrs. Yancey, we conclude that there is not substantial evidence on the record as a whole to sustain the findings that the discharges of Grace McCart, Pearl Coker and Ruth Brooks were wrongful.

On January 18, 1958, the union sent to the Respondents a letter listing twelve employees who were therein said to be members of the union and serving on the organizing committee, and that these employees had "been fully advised of their rights under the National Labor Relations Act," and that they were "protected in their rights to join and assist the union by Sec. 8, A(3) of the National Labor Relations Act as amended." On January 24, 1958, there was a lay-off of a number of the Respondents' employees. The lay-off resulted from a decline in business which necessitated a cutback in production. Included among those who were laid off were nine of those listed in the letter of the union to the Respondents. The Examiner and the Board found that the nine had been laid off because of their union activity. Those in charge of the Respondents' management testified as to the method used in the selection of those who were to be laid off. This testimony was plausible and, on the whole, consistent. It was largely uncontradicted. It would not have been found, we think, that the General Counsel had sustained the burden of proof as to discrimination but for the letter of the union and the fact that Morris Scharff had asked those who were named if the use of their names had been authorized.

It may be that in the absence of the letter from the union, the Respondents would have been guilty of interference if they had questioned employees regarding their union membership and activities, although this is not certain and is not before us for decision. Where, however, the union has notified the employer of the activity for the union of certain of the employees, no interference results from an inquiry as to the correctness of the union statement. Cf. N. L. R. B. v. Montgomery Ward & Co.,

2 Cir., 1951, 192 F.2d 160; Sax v. N. L. R. B., 7 Cir., 1948, 171 F.2d 769. It is well settled that an employee may not be discharged because of union activity. It is also true that union membership and union activity do not insulate an employee from being discharged where an unlawful motive has not been shown. N. L. R. B. v. Ingram, supra; N. L. R. B. v. Hudson Pulp & Paper Corporation, supra; N. L. R. B. v. Raymond Pearson, Inc., 5 Cir., 1957, 243 F.2d 456; N. L. R. B. v. The Newton Company, supra; N. L. R. B. v. Huber & Huber Motor Express, 5 Cir., 1955, 223 F.2d 748; N. L. R. B. v. Williamson-Dickie Mfg. Co., 5 Cir., 1942, 130 F.2d 260; N. L. R. B. v. Tex-O-Kan Mills Co., supra.

Evidence is admissible in a proceeding to determine whether or not there has been anti-union discrimination in a lay-off of the percentage of union adherents involved. N. L. R. B. v. The Newton Co., supra, N. L. R. B. v. Nabors, 5 Cir., 1952, 196 F.2d 272, certiorari denied 344 U.S. 865, 73 S.Ct. 106, 97 L.Ed. 671. There is no finding as to the percentage of union adherents retained or laid off. There is no finding as to the extent of the activity for union organization of union members laid off as compared with those retained. There is a finding that nine were laid off out of the twelve designated by the union in its caveat served upon the company. The fact that the Respondents disregarded the obvious effort of the union to prevent the discharge of those designated by it is of little weight in drawing an inference of a discriminatory discharge.

The selection of the employees to be laid off had been determined before the union's warning had been delivered, if the witnesses for the Respondents are to be believed. They were not believed by the Examiner or the Board. The Respondents' management assigned plausible and reasonable grounds for the selection of each of those who were laid off. The factual basis for the selections as given by the Respondents' witnesses were largely uncontradicted. The Examiner, however, and the Board, rejected the reasons asserted by the Respondents and found the motive for the selection of the nine committeemen was their union membership. In so doing, the Board placed its own evaluations upon the factual situations, assumed managerial prerogatives, and reached the conclusions that good business judgment would not have justified the Respondents in their selections for lay-offs and therefore, says the Board, the motive was the unlawful one.

In the frequently quoted opinion of N. L. R. B. v. Tex-O-Kan Flour Mills Co., supra, it was said:

"In each such case such membership may have been the cause [of discharge or lay-off], for the union was not welcomed by the persons having authority to discharge and employ. If no other reason is apparent, union membership may logically be inferred. Even though the discharger disavows it under oath, if he can assign no other credible motive or cause, he need not be believed. But it remains true that the discharger knows the real cause of discharge, it is a fact to which he may swear. If he says it was not union membership or activity, but something else which in fact existed as a ground, his oath cannot be disregarded because of suspicion that he may be lying. There must be impeachment of him, or substantial contradiction, or if circumstances raise doubts, they must be inconsistent with the positive sworn evidence on the exact point." 122 F.2d 433, 438–439. See N. L. R. B. v. Cosco Products Co., supra.

The Board has, in this case, been so obsessed with and fixed upon the anti-union attitude of the Respondents that it has rejected all other considerations for the questioned discharges and lay-offs. It is appropriate to say here, as was said in the McGahey case:

"But as we have so often said: management is for management. Neither Board nor Court can second-guess it or give it gentle guid-

ance by over-the-shoulder supervision." N. L. R. B. v. McGahey, supra [233 F.2d 413].

We reach the conclusion that the Board's General Counsel has failed to carry the burden of showing by substantial evidence on the record as a whole that the lay-offs were discriminatory, and therefore the portion of the Board's order directing reinstatement of the specified nine employees who were laid off will not be enforced.

The petition for enforcement will be granted in part, modified as herein provided, and denied in part.

Enforced in part; denied in part.