The GREAT ATLANTIC AND PACIFIC TEA CO., Inc., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 22180.

United States Court of Appeals Fifth Circuit.

Jan. 10, 1966.

H. L. Deakins, Jr., Houston, Tex., Fulbright, Crooker, Freeman, Bates & Jaworski, Houston, Tex., of counsel, for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Paul M. Thompson, Atty., N.L.R.B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Elliott Moore, Atty., N.L.R.B., for respondent.

Before TUTTLE, Chief Judge, COLEMAN, Circuit Judge, and HUNTER, District Judge.

HUNTER, District Judge.

The Great Atlantic and Pacific Tea Company, Inc., asks that we review and set aside an order of the National Labor Relations Board issued against the Company on October 26, 1964. In its answer, the Board petitions for enforcement. The Board found, as did the Trial Examiner, that the Company violated Section 8(a) (3) and (1) of the Act by discharging Alice Davis because of her union activities. It also found that the Company violated Section (8) (1) by coercively interrogating employees Davis and Rosalie Sublett.[1]

Alice Davis began working as a Clerk in the Company's Freeport, Texas store in 1956. A few weeks later she was made Head Cashier, a position which she held for seven years. In April of 1963, the Company laid off a checker and advised

1. The Board's decision and order are reported at 149 N.L.R.B. No. 12.

Davis that because of a decline in business, Store Manager Roddy would assume her duties as head cashier, and she would work exclusively as a checker. On May 20, 1963, Lawrence Smallwood replaced Roddy as the Manager of the store, and Smallwood gave the job of cashier to his wife. Subsequently, when asked to help Mrs. Smallwood with her duties as cashier, employee Davis informed Smallwood that she would cooperate in every way possible, but that she might not be in Texas much longer, and that she might like to transfer to Mississippi, her home state, at some future date. The next day (May 21st) when Davis told two employees of a nearby unionized store (Neisner's) that they were having difficulties with their new manager, one of these employees suggested that A & P store needed a union. Davis inquired as to how this could be accomplished and was advised that all that was needed was to get the employees to sign authorization cards for the union. Store Manager Smallwood observed this conversation from 10 to 15 feet distance. After her conversation with the two Neisner's employees, Davis began "talking union" with various of the A & P employees. Sometime between May 21st and June 1st, Davis discussed the subject with Assistant Store Manager Munson.

On May 29th, while Davis was checking groceries, Lindsey, Matthews and Vaughn—all employees of Neisner's—took their purchases to her station. When Lindsey asked Davis what the A & P employees had done about the union, Davis said she was waiting for the authorization cards and would distribute them if Lindsey brought them in. Shortly afterwards, Smallwood, who had been standing about four feet away at another checkout counter, approached Davis and asked her what she had decided about a transfer. Davis explained to him that there was a good chance that her husband, who previously had been laid off by Dow Chemical, might be recalled and that "we don't know what we are going to do yet." She further stated that if they should decide upon a transfer "I will give you a

two-week notice before I ask for a transfer."

On May 31, 1963, the Company area supervisor, Read, came to Freeport and spoke to Smallwood. Sometime later Read approached Davis, who was price-marking some cigarettes, and inquired of her "how she felt about union labor." Davis told Read that she was "for union labor one hundred percent. If it wasn't for the unions, everybody would be working for chicken feed and eating with the chickens." Read turned around, went back to the meat counter and continued his conversation with Smallwood. Employee Ethel Smith, who was working in the meat department, was only ten feet away from Read and Smallwood when they engaged in this conversation. Smith overheard one of the participants in the conversation mention something "about the union" and "about Mississippi;" she then heard one of them say "get rid of her." Smith deliberately attempted to overhear this conversation when she heard the word "union" mentioned because she "knew there was talk in the store of organizing a union." The next day, June 1st, Davis went to the office to have her cash register checked. After sacking her money, Smallwood placed a termination notice on her tray. When Davis inquired "what on earth is going on" Smallwood told her to read the notice. Davis read the back of the notice which contained the following handwritten entry:

"On the 5-20-63 this clerk informed me that she would not be working for us in Freeport, Texas, much longer. She stated that she planned to move to Mississippi. I believe it best to replace her while I have an experienced checker available."

After reading this notice, Davis told Smallwood that she had never told him she was quitting or that she wanted to transfer yet. Smallwood replied that she was "free to transfer now." She requested a copy of her termination notice but Smallwood refused to give her one. Davis then signed her time card and left the store.

On August 12, 1963, about six weeks after Davis was discharged, she met Munson for coffee. During this meeting, Davis asked Munson, among other things, the reason for her discharge. Munson at first avoided the question, but as they were leaving Munson told her that she had been terminated "because she was talking union talk in the store and was talking about moving back to Mississippi." Mrs. Preston Miller was present during this conversation and testified that Munson told Davis not once, but twice, that "he told him that he terminated her because she was talking union talk in the store and was talking about moving back to Mississippi."

Employee Rosalie Sublett replaced Davis as a checker after her discharge on June 1st. During the latter part of July, Sublett was approached by Smallwood who inquired "what the union talk was about and what was going on." Sublett replied that she did not know, and when Smallwood asked her who had talked to her about the union, Sublett refused to give him any names.

The Board's order requires the Company to cease and desist from the unfair labor practices found, and from, in any like or related manner, interfering with its employee's rights under the Act. Affirmatively, the Board's order requires the Company to offer reinstatement to Davis, to make her whole for any loss of pay she may have suffered, and to post appropriate notices.

It would be little, if any, benefit to discuss the numerous cases cited by the litigants. This is so because each decision turns upon its particular facts. In our recitation of the facts here, it should be pointed out that the Company's witnesses denied almost every fact upon which the Board's decision was based and related a substantially different account of the events leading up to Davis' discharge. In earlier decisions, we characterized "reinstatement with back pay" as being in the nature of a penalty, and have said, in essence, that in reinstatement cases the Board should accept the employer's explanation, if the evidence gives equal support to it, because the employer is under oath and knows the real cause of discharge.[2]

The Supreme Court, in N.L.R.B. v. Walton Mfg. Co., 1962, 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed.2d 829, eliminated any residual doubt from these decisions by holding categorically that "there is no place in the statutory scheme for one test of the substantiality of evidence in reinstatement cases and another test in other cases."

The only issue here is whether the findings of the Board are supported by substantial evidence on the record considered as a whole. We cannot disturb the Board's choice if there is a fair conflict between the employer's testimony and a reasonable inference of discrimination. N.L.R.B. v. Florida Citrus Canners' Co-op., 5 Cir. 1963, 311 F.2d 541; N.L.R.B. v. Walton Mfg. Co., 5 Cir. 1963, 322 F.2d 187. The Board is not compelled to accept the employer's statement when there is reasonable cause for believing that the ground put forward by the employer was not the true one, and that the real reason was the employer's dissatisfaction with the employee's union activity. N.L.R.B. v. Texas Bolt Co., 5 Cir., 313 F.2d 761. When faced with a review of findings, pegged on witness credibility, courts have generally held that a determination of credibility by the N.L.R.B. is not to be reversed unless there is uncontrovertible evidence to the contrary. N.L.R.B. v. Dixie Gas Co., 5 Cir. 1963, 323 F.2d 433; N.L.R.B. v. Camco, Inc., 5 Cir. 1965, 340 F.2d 803.

2. N.L.R.B. v. Tex-O-Kan Flour Mills Co., 122 F.2d 433; N.L.R.B. v. Williamson-Dickie Mfg. Co., 130 F.2d 260; N.L.R.B. v. Alco Feed Mills, 133 F.2d 419; N.L.R.B. v. Ingram, 273 F.2d 670; N.L.R.B. v. Allure Shoe Co., 277 F.2d 231; Frosty

Morn Meats, Inc. v. N. L. R. B., 296 F. 2d 617; N.L.R.B. v. Walton Mfg. Co., 286 F.2d 16; N.L.R.B. v. Florida Citrus Canners' Co-op., 288 F.2d 630, reversed 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed.2d 829.

■ Our conclusion is that the findings of the Board are "supported by substantial evidence on the record considered as a whole."[3] The petition for enforcement of the Board's order is granted.

---

3. 29 U.S.C.A. 160(e); Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.