## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## CENTENO SUPER MARKETS, INC., Respondent.

### No. 76–1577.

United States Court of Appeals, Fifth Circuit.

July 5, 1977.

Rehearing and Rehearing En Banc Denied Sept. 26, 1977.

Elliott Moore, Deputy Assoc. Gen. Counsel, Jay Shanklin, Supervisor, Charles Shaw, Atty., N.L.R.B., Washington, D.C., for petitioner.

George P. Parker, Jr., John N. McCamish, Jr., C. J. Fitzpatrick, San Antonio, Tex., for respondent.

Louis V. Baldovin, Jr., Director, Region 23, N.L.R.B., Houston, Tex., for other interested parties.

Before GODBOLD, SIMPSON and GEE, Circuit Judges.

PER CURIAM:

The National Labor Relations Board (Board) asks for enforcement of the Board's Decision[1] Order relating to the Centeno Super Markets, Inc., (Centeno) San Antonio, Texas. The primary issue is whether there was substantial evidence on the record as a whole to support the Board's findings that Centeno (1) violated Section 8(a)(1) of the

1. Reported at 220 NLRB No. 178.

National Labor Relations Act, 29 U.S.Code, Section 158(a)(1), by interrogation and surveillance of employees, threats of reprisals against employees if they selected a union, and the granting of wage increases and other new benefits to discourage self-organization of its employees, and (2) also violated Section 8(a)(3) and 8(a)(1) of the Act, 29 U.S. Code, Section 158(a)(3) and 158(a)(1), by discharging 10 employees because they supported unionization. Additionally, respondent Centeno raises a question as to whether the Board's order was overly broad, and hence improperly required the reinstatement of terminated employees.

Centeno is a family owned business composed of three grocery markets in San Antonio, Texas. In July, 1974, Retail Clerks Union, Local 455, began organizational efforts at Centeno's three stores, with the first meeting occurring on July 22. Within a few weeks of this meeting several employees were discharged. The Board found that the employees were fired because of their pro-union activity. This was supported by the testimony of the fired employees, and by the fact that most of the employees involved had signed union authorization cards. Centeno contends that the discharges occurred for good cause, and that the company was practically unaware of any union activity by the employees involved. The Administrative Law Judge, on the whole, credited the testimony of the employees, and discredited the testimony of the company, and found that Centeno had violated §§ 8(a)(1) and 8(a)(3) of the Act.

The Administrative Law Judge's decision was reviewed by a three-member panel of the Board, pursuant to Section 3(b) of the National Labor Relations Act, 29 U.S. Code, Section 153(b). The panel affirmed the ALJ's rulings, findings, and conclusions, with some slight modifications.

■ As we have stated, *Great Atlantic and Pacific Tea Co. v. N.L.R.B.*, 354 F.2d 707, 709 (5th Cir. 1966), "[w]e cannot disturb the Board's choice if there is a fair conflict between the employer's testimony

and a reasonable inference of discrimination." In view of the scope of our review of Board orders, we find the Board's affirmance of the Administrative Law Judge's findings and conclusions that the company's discharging of the involved employees was discriminatorily motivated is supported by substantial evidence, and is therefore conclusive. See *N.L.R.B. v. Link-Belt Co.*, 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368 (1941). The ALJ and the Board made legitimate credibility choices between conflicting versions of events, and drew legitimate inferences from the evidence presented.

■ We further find that the proposed order of the Administrative Law Judge, as amended by the Board, is both proper and not overly broad, and decline to disturb it. "The particular means by which the effects of unfair labor practices are to be expunged are matters 'for the Board not the courts to determine.'" *Virginia Electric & Power Co. v. N.L.R.B.*, 319 U.S. 533, 539, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568, 1574 (1943).

ENFORCED.

GEE, Circuit Judge (concurring in part and dissenting in part):

From the outset I emphasize the limited character of my disagreement with the majority of the court. The record, which chronicles a long hearing with sharply conflicting testimony from many witnesses, contains ample support for the conclusion that the opposition of the Centeno family and some of their supervisory employees to unionization crystallized into the commission of several unfair labor practices during Local 455's attempt to organize Centeno employees. My concern focuses upon what appears from the record and the decision of the Administrative Law Judge (ALJ)—affirmed by the Board in all respects—to have been an almost uniform discrediting of company witnesses and crediting of Board witnesses, in some circumstances when even the cold record militates for the opposite result. The ALJ's access to demeanor evidence[1] normally places his credibility

---

1. See *NLRB v. Walton Mfg. Co.*, 369 U.S. 404, 408, 82 S.Ct. 853, 855, 7 L.Ed.2d 829, 832 (1962), *rev'g NLRB v. Florida Citrus Canners*.

choices out of the reach of the reviewing court, but preservation of the utility and fairness of the administrative hearing requires that we decline to follow him on the rare occasion when he lists too far to either side. This appears to me to be that rare case, and since the majority would enforce the Board's order in its entirety, I must respectfully dissent from the grant of enforcement of the orders for reinstatement of Dolores Mireles and Anita Gonzalez.

We have the power to resolve questions of credibility against the choices made by the ALJ "in a proper case," *NLRB v. American Art Industries, Inc.,* 415 F.2d 1223, 1227 (5th Cir. 1969),[2] although it is difficult to articulate standards for determining just what constitutes a "proper case." We have, for example, denied enforcement when the Board's order depended on acceptance of the testimony of two crucial Board witnesses and the hearing examiner had "expressed a theory of credibility that was so far foreign to that which he should have applied that '[s]ound reason . . . require[d] us to decline to go with the Exam-

iner . . . .' " in crediting and discrediting testimony. *NLRB v. Florida Citrus Canners Cooperative,* 311 F.2d 541, 543 (5th Cir. 1963), on remand from *NLRB v. Walton Mfg. Co.,* 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed.2d 829 (1962). Additionally, although an ALJ's uniform resolution of credibility questions in favor of Board witnesses and against company witnesses cannot of itself support a finding of improper bias vitiating his choices, *NLRB v. Pittsburgh Steamship Co.,* 337 U.S. 656, 659–60, 69 S.Ct. 1283, 1285, 93 L.Ed. 1602, 1606 (1949); *NLRB v. Bush Hog, Inc.,* 405 F.2d 755, 756 (5th Cir. 1968),[3] we have found that such a pattern of consistent credibility decisions at least justifies a closer scrutiny of the record than might otherwise be undertaken. *NLRB v. Walton Mfg. Co.,* 286 F.2d 16, 21 (5th Cir. 1961), *rev'd on other grounds,* 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed.2d 829 (1962). Here the ALJ's written decision contains only one instance of discrediting the testimony of employees,[4] against a background of consistent crediting of Board witnesses at the expense of the company. Thus, closer scrutiny becomes appropriate here, and upon its

*Cooperative,* 288 F.2d 630 (5th Cir. 1961), *and NLRB v. Walton Mfg. Co.,* 286 F.2d 16 (5th Cir. 1961).

2. Almost with one voice the Courts of Appeal for other circuits agree, although differing standards are used. *See, e. g., NLRB v. Bangor Shoe Mfg. Co.,* 308 F.2d 948, 949 (1st Cir. 1962) (credibility choice subject to review "when it oversteps the bounds of reason" or the Board has "fallen into a clear mistake"); *NLRB v. Columbia University,* 541 F.2d 922, 928 (2d Cir. 1976) (credibility choice to be overturned when "on its face it is hopelessly incredible"); *NLRB v. Jackson Maintenance Corp.,* 283 F.2d 569, 570 (2d Cir. 1960) (choice not determinative when the record creates "doubts with respect to the truthfulness of the witness so powerful that they outweigh any evaluation based upon demeanor"); *NLRB v. Armcor Industries, Inc.,* 535 F.2d 239, 241 n.3 (3d Cir. 1976) (court may question ALJ's judgment where his explanation of credibility choice is "clearly insufficient"); *NLRB v. Holly Farms Poultry Industries, Inc.,* 470 F.2d 983, 985 (4th Cir. 1972) (credibility findings must be accepted when supported by "substantial evidence on the whole record"); *NLRB v. Elias Brothers Big Boy, Inc.,* 327 F.2d 421, 426 (6th Cir. 1964) (reversing credibility finding where examiner "credited the testimony of a highly prejudiced and interested witness and discredited the testimony of all witnesses to the contrary"); *NLRB v. Wagner Iron Works,* 220 F.2d 126, 142 (7th Cir. 1955), *cert. denied,* 350 U.S. 981, 76 S.Ct. 466, 100 L.Ed. 850 (1956) (choices may not be disturbed "unless we can say that the credited witnesses could not possibly be believed"); *NLRB v. Morrison Cafeteria,* 311 F.2d 534, 538 (8th Cir. 1963) (credibility resolution reviewable only if "shocking to our conscience"); *NLRB v. International Longshoremen's & Warehousemen's Union,* 514 F.2d 481, 483 (9th Cir. 1975) (reverse credibility findings only if "a clear preponderance of the evidence convinces that they are incorrect"); and *Santa Fe Drilling Co. v. NLRB,* 416 F.2d 725, 729 (9th Cir. 1969) (overturn credibility assessment if it "contains clear error").

3. This rule is as it should be; it is hardly inconceivable that on occasion one side in a dispute could be entirely in the wrong and the other entirely in the right.

4. Three employees testified that company president Eloy Centeno, while discussing improved benefits with company employees, asked if any of them had signed a union card. Discrediting their testimony, the ALJ found that the evidence failed to support a charge of unlawful interrogation of employees.

application I find at least two of the reinstatement orders lacking in evidentiary support and thus unworthy of enforcement.

The first of these concerns Dolores Mireles, a telephone operator in the courtesy booth of one of Centeno's stores. On July 22, 1974, she signed a union authorization card in a union meeting on the store parking lot after closing hours. She was discharged, at the direction of store manager Lansdale, when she reported to work on July 24. Lansdale and grocery manager Karam testified to Mireles' history of excessive talking to other employees and use of the telephone for personal calls, both hers and those of other employees; both testified that Lansdale had wanted to fire Mireles about six weeks before her actual discharge but that Karam had intervened and received permission to give her one more chance after a stern warning about personal phone calls and talking. Lansdale testified that the final decision to discharge her came after he observed a playful pushing and shoving incident between Mireles and a sackboy as she issued him a clean apron on the evening of July 23. Mireles denied that the apron incident occurred and initially denied that she had ever been warned about excessive talking or personal phone calls, although the latter testimony was undermined on cross-examination.

The ALJ found that assistant manager Jaramillo observed the union meeting at which Mireles signed her union authorization card and that he asked Mireles the next day whether she signed a card. Jaramillo denied any such interrogation, but the ALJ found that he was trying to conceal what actually occurred and credited Mireles' account over Jaramillo's denial. From other circumstances,[5] he also found

that Jaramillo informed Lansdale of Mireles' signing of the card, that Lansdale was a "most untrustworthy witness," that the apron incident was a total fabrication, and that "Lansdale gave much conflicting testimony he thought would help the Company's cause." Disbelieving Lansdale, Jaramillo and Karam necessarily meant believing Mireles, whom the ALJ found to be an "honest, forthright witness," when the record creates strong doubts in my mind concerning her testimony. The ALJ lauded her, for example, for being "willing to admit any of her shortcomings," including allowing other employees to make outgoing nonessential telephone calls not permitted by the manager. Aside from the fact that consistently breaking rules speaks as eloquently for dishonesty as for honesty, Mireles had earlier testified that she did *not* allow nonemergency phone calls after she became aware of the rules; backtracking and modifying testimony under such circumstances hardly makes her an "honest, forthright witness." Much more of an eye-opener, pertinent to the ALJ's misapprehension of his duty in judging her credibility, is the following passage from his opinion:

> When subjected to lengthy, vigorous cross-examination, she even agreed with the counsel's characterization of a mistake in her pretrial affidavit as a "lie," although her testimony is clear that it was an unintentional error.

The questioning which led up to her admission of lying under oath went as follows:

Q: Ms. Mireles, were you ever warned by anybody . . . about excessive talking or misuse of the telephone?

A: No, sir.

---

5. Ms. Mireles testified that she was in the courtesy booth on Tuesday evening, July 23, when Lansdale came into the booth and used one of the telephones. She said that she heard Lansdale speaking of the previous night's meeting and the fact that several employees had signed union authorization cards. She heard no more of the conversation because another phone rang and she had to answer it, but she testified that within a few minutes president Centeno arrived at the store and Lansdale "walked over

like he was expecting him." Although Ms. Mireles avoided testifying that she knew Lansdale was speaking to Centeno on the telephone, the ALJ wrote in his decision that the person on the other end of the line was "presumably President Centeno" and found from these circumstances that Centeno did find out about union activity on July 23 and personally participated in the July 23 decision to fire Ms. Mireles for fabricated reasons.

Q: At no time . . . were you warned?

A: No, sir.

She was then confronted with the transcript of her testimony in a Texas Employment Commission hearing on her request for unemployment benefits, during which she was asked if she had ever been "counseled" (the questioner's word) concerning excessive talking and personal telephone use; she had replied, "I was up at Mr. Karam's office one time, and he did *warn* me. It was a *warning* that there was a little too much talking going on." Cross-examination continued, with Mireles insisting first that Karam's statement had not amounted to a warning and then that it was not specifically directed at her. Eventually, she was read the following passage from her affidavit to the General Counsel of the NLRB:

> At no time during my employment was I told or warned by any supervisor to stop any type of conduct that would lead to my discharge. I was never verbally reprimanded by any supervisor.
>
> At no time did he [Karam] or anyone else tell or warn me about my breaking any of the rules.

In response to a direct question, Mireles finally admitted that the last sentence quoted above was a lie.

I am wholly unable to conclude that the ALJ properly exercised his power to resolve credibility questions when he rehabilitated Ms. Mireles as a witness by pointing to an admitted incident of lying under oath. I am baffled by his apparent finding that her statement in the pretrial affidavit was a "mistake" and that "her testimony is clear that it was an unintentional error." I find no testimony in the record—whether "clear" or otherwise—to the effect that the statement was a mistake or an unintentional error, and thus no evidentiary support for the ALJ's unequivocal assertion to that effect. The finding that Ms. Mireles was unlawfully discharged for specious reasons rested on the finding that her testimony was believable. The record displays a pattern of evasions and several belated admissions that prior statements of hers were less than accurate. Because I consider that the ALJ in crediting a witness on the basis of her admission of prior perjury "expressed a theory of credibility that was . . . far foreign to that which he should have applied," *NLRB v. Florida Citrus Canners Cooperative*, 311 F.2d 541, 543 (5th Cir. 1963), I would deny enforcement of the order to reinstate Ms. Mireles with back pay.

I also believe the ALJ and the Board took leave of the record in considering the firing of grocery checker Anita Gonzalez. She signed and delivered to a union representative her authorization card on July 24, 1974; she was terminated on July 26. She testified, and the ALJ found, that July 25 was her day off and that she was called to president Centeno's office on July 26 and fired for telling other workers of the need for union seniority, using herself (and her recent change to night hours despite her 16 years with the store) as an example. The company's version of the firing was, of course, quite different. Reginaldo Trevino, a bread salesman whose route included the Centeno store where Ms. Gonzalez worked, testified that she was working on the evening of July 25 when he and his wife came through her checkstand with their groceries. In response to a routine "how are you doing" type of question, the salesman testified, Ms. Gonzalez launched into a venomous, cursing description of what she would like to see happen to president Centeno; after leaving the store, the salesman and his wife discussed the incident and decided that Centeno should know of it. The next day while servicing the store Mr. Trevino went to Centeno's office and informed him of the previous evening's episode. Shortly thereafter, Ms. Gonzalez was called into president Centeno's office and asked about her attitude. The "tirade" into which she then launched resulted in her dismissal. Trevino's wife, who was under the Rule and thus not in the courtroom when he testified, corroborated his account with her testimony.

The ALJ's explanation of why he chose to believe Ms. Gonzalez' version of the firing

and disbelieve the Trevinos and Centeno illustrates his selective highlighting of supportive sections of some mixed-bag testimony while conveniently ignoring the almost-inseparable, less supportive parts and his undue emphasis on factors which provide only flimsy support for his choice. He found, for example, that the Trevinos' testimony was not convincing because it sounded "contrived," partly because Ms. Gonzalez was alleged to have used a quite vulgar Spanish expression in describing her wishes for Centeno, and because she was alleged to have said it "with a lot of malice in her heart." Of course, people ofttimes use vulgar expressions, in which case factual reporting must contain those same vulgar words (or, as here, their translations), and they often do so because they are angry, or have "a lot of malice" in their hearts. He noted also that the incident was not reported to president Centeno until a day later, but the Trevinos testified that it was not until after they got away from the unpleasant scene and discussed it that they decided that Centeno should be informed of it, and it was certainly understandable for Trevino to wait until the next day when his bread route would take him to the store three or four times rather than turning back to the store in the evening when they presumably had other places to go and president Centeno might not be in the store. The ALJ further noted that "Gonzalez is not accused of ever using such language, or cursing Centeno or the store, at any time before." He thus conveniently limited the objects of her cursing so as to exclude store manager Benavides, who, according to employee Enriqueta Vasquez, Gonzalez several times called "jotinche" (effeminate man) or "joto" (queer) with appropriate embellishments. The ALJ stated that he had considered the testimony of Vasquez, who testified that "she never heard Gonzalez make any derogatory remarks about [president] Eloy Centeno or any of the Centeno family." Again, it is the omission that deafens; Vasquez also testified that she *did* see Gonzalez make bad, mocking faces behind Centeno's back on several occasions. Finally, the ALJ noted that Gonzalez denied seeing the Trevinos in the store on the day in question, but he passed over Mr. Trevino's identification of the check with which he paid for the groceries—strong evidence that he was indeed in the store. In short, the ALJ appears to have shored up a questionable choice in favor of Gonzalez' testimony by editing testimony of some witnesses and by using factors which as strongly support the conflicting testimony of the Trevinos and president Centeno as the testimony of Gonzalez. Discounting what I consider to have been the erroneous reasoning in the credibility area, I am unable to conclude with him that the firing of Ms. Gonzalez was on a pretext designed to cover up unlawful motivation. Accordingly, I would deny enforcement of the order to the extent that it requires her reinstatement with back pay.

The deference which we accord an Administrative Law Judge in cases such as this reflects our understanding of the undoubted advantage he possesses in hearing the witnesses, seeing their mannerisms, experiencing their fits and starts and evasions. But when his choices veer toward incredibility, we must cease to defer to them as sheltered credibility choices. Only by calling attention to his departures and refusing to enforce the Board's order to the extent it is based on such departures can we ensure that the administrative hearing fairly and efficiently serves its intended function. To that end I direct this dissent.